UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jane Doe,<br>　　　Plaintiff<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>　　OF JUSTICE, DRUG<br>　　ENFORCEMENT ADMINISTRATION<br><br>MERRICK B. GARLAND, as Attorney General of<br>　　the United States Department of Justice,<br>　　　Defendant | C.A. No.: |

## COMPLAINT

### Introduction

1. The Plaintiff, Jane Doe, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § et. seq., 42 U.S.C. §2000e-5 (Enforcement Provisions), 42 U.S.C. §2000e-16 and 42 U.S.C. 1981a, 28 U.S.C. §1367 and 28 U.S.C. §1391 to remedy acts of discrimination and other workplace (both work related and unrelated) violations and other violations of law committed against her by the Drug Enforcement Administration (DEA), an Agency of the United States Department of Justice (DOJ).

### Jurisdiction

2. This Court has jurisdiction over the subject matter of this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq., §2000e-5, §2000e-16. Additionally, Department of Justice (DOJ) Final Agency Decision issued September 8, 2023 sent

1

its notice/right to file a civil suit in U.S. District Court to the Plaintiff conferring jurisdiction in this Court of its mixed case claims of discrimination and other violations of law rules or regulation.

### Venue

3. Venue is proper in this judicial district under 42 U.S.C. §2000e-5(f)(3) in as much as the unlawful employment practices and discrimination complained of herein were committed in the Southern District of New York and because the aggrieved person, i.e. the Plaintiff, did work in the Southern District of New York and would have worked there but for the Defendant's unlawful employment practices and her illegal removal from her work. Moreover, DOJ Final Agency decision not only confers jurisdiction but also confers venue in an "appropriate District Court" i.e. where the claims controversies and issues took place (see infra).

### Parties

4. Plaintiff is 36 years old, is a citizen of the United States currently residing in the State of New Jersey. The Plaintiff was employed by the DEA beginning January 29, 2023. In April, 2023, plaintiff was illegally removed from her position/job. At that time, Plaintiff was employed by the DEA as a Special Agent, Series 1811, Criminal Investigator, Classification – Career Tenure Grp. 1 Grade Services (GS) 13 Step.

5. The Defendant, DOJ/DEA, is a department within the executive branch of the United States Government along with its Agency (DEA) component.

6. The Defendant, Merrick B. Garland, is the Attorney General of the United States and is being sued herein in his official capacity as attorney general.

7. The Defendant, Anne Milgram is the Agency Head or Administrator of the DEA and is being sued herein in her official capacity as the DEA Administrator.

## Facts

8. The Plaintiff is a competitive service, career tenure Grp 1 status employee of the United States Justice Department, Drug Enforcement Administration (DEA), EOD January 29, 2012; post of duty New York Division, New York, NY. Job series 1811, Criminal Investigator, Special Agent GS-13 Step 4.

9. On or around September, 2017, Plaintiff, the aggrieved party (A.P.) was directed by her supervisor Mr. Aaron Koger to accompany him to attend a case related meeting in Cartagena, Colombia.

10. While in Cartagena, Colombia, Plaintiff's supervisor introduced her to a friend and colleague of his, Mr. Jose Irizarry (*stationed in the Cartagena DEA Office*). Plaintiff had never met nor worked with S/A Jose Irizarry previously.

11. Sometime after work that day, Plaintiff was called by its supervisor Mr. Koger at Plaintiff's hotel. Mr. Koger told Plaintiff. that Agent Jose Irizarry and his wife Nathalie had invited several DEA and other law enforcement colleagues to his house in Cartagena for dinner.

12. At the dinner, a private social event, Plaintiff met Jose Irizarry's wife Nathalie. During the evening, Nathalie and Jose Irizarry made attempts to sexually seduce Plaintiff making passes, sexual suggestions, and innuendo.

13. Sometime during the evening, while being sexually suggestive, Nathalie, unsolicited, placed a blue pill in Plaintiff's hand. Plaintiff did not know what it was but believed

at the time due to her sexual seductive behavior towards Plaintiff, it was viagra or some sort of sexual enhancement aid.

14. Plaintiff never ingested the pill and discarded it when she, along with several others at the party, went into the pool and hot tub together.

15. Plaintiff entered with her underwear as did others, most were nude and most if not all were drinking alcohol throughout the evening. While in the hot tub talking with another woman, Marisa Darden, (*a federal prosecutor from Ohio*) they consensually kissed and embraced. There were at least six persons together in the hot tub.

16. A topic of conversation started relating to Plaintiff's leaking breasts as Plaintiff was lactating during that period of time (recent pregnancy); this conversation was normal, non-threatening and innocently brought on. Plaintiff demonstrated by hand expressing her colostrum and showed the other women.

17. They all (the invitees) stayed in the pool or hot tub and then Plaintiff left later in the evening escorted back to her hotel by her supervisor and another agent.

18. The next day after work Plaintiff and several other invited guests went on Jose and Nathalie's boat, had some drinks, enjoyed the sunshine and sea air.

19. Sometime during the outing on the boat, Plaintiff was again given a blue pill unsolicited by Jose Irizarry after coming out of the bathroom on the boat.

20. Plaintiff discarded it under the seat covering of the boat and just went along with the banter.

21. Plaintiff and the other guests all enjoyed the rest of the afternoon on the boat and returned after several hours. Plaintiff and the other guests all chipped in for the fuel expense and left the marina.

22. Plaintiff returned to her hotel accompanied by her supervisor. Several agents were staying at the same hotel during that same time period.

23. Plaintiff told her supervisor that Jose's wife was hitting on her making sexual passes at her the previous night and so was Jose, suggesting the three of them get together.

24. Plaintiff, Plaintiff also told him she (Nathalie) gave her a blue pill and Jose did the same today on the boat while they were coming on to Plaintiff (making sexual advances).

25. Plaintiff's boss laughed but then said, you didn't take it did you?

26. Plaintiff told him no, I didn't, I didn't know what it was, Viagra, a ruffe, it was blue.

27. Plaintiff told him she didn't know what to do or how to act because they were his friends and he was being held out to be this sort of super-agent; everyone talked highly of him so she just went along, put the pill under the boat cushion she was sitting on and let the other one dissolve in the hot tub.

28. Plaintiff's supervisor said don't worry about it, you did the right thing. I'll handle it.

29. Plaintiff and her supervisor left Cartagena soon thereafter and returned to the office in New York.

30. Plaintiff never heard a word about that night and afternoon on the boat at the Irizarry's until some five years later in January 2022.

31. Plaintiff learned sometime between 2020 and 2022, unbeknownst to Plaintiff previously that Jose and Nathalie Irizarry were being investigated by the FBI, OIG, HSI and IRS for trafficking drugs and laundering money with some of Nathalie's relatives from Colombia.

32. The FBI later arrested Irizarry and his wife and the U.S. Attorney's office in Florida indicted (sealed indictment) Jose and Nathalie Irizarry on February 21, 2020 (unsealed) and another individual, a DEA informant.

33. Plaintiff was informed that publicly, the indictment of Irizarry was an embarrassment to DEA and remains a big scandal at DEA.

34. Plaintiff learned Jose and Nathalie immediately began cooperating with the government and DEA for promises of leniency after pleading guilty to drug trafficking and corruption charges and continue to do so.

35. The Plaintiff and dozens of DEA agents who came in contact with Jose Irizarry have been investigated.

36. Plaintiff learned Mr. Irizarry and his wife, in attempts to get sentence reductions, have pointed the finger and informed on dozens of DEA agents, alleging they were criminals and it was those DEA agents who made him corrupt, taught him and conspired with him to steal, embezzle and laundered drug proceeds with him. *(See plea agreement statements and statements at pre-sentencing and sentencing of Jose Irizarry.)* Not one DEA agent after five years of investigation has ever been charged, arrested or convicted of participating in any crime with Irizarry or his wife despite his claims.

37. *From January 2022, that point at which OPR targeted Plaintiff, until her formal removal in April 2023, DEA OPR et. al, portrayed Plaintiff as some type of unethical, bad and immoral sexual deviant. Plaintiff's character was defamed and OPR unjustly profiled her as a corrupt agent.*

38. On January 25, 2022, Plaintiff was ordered to HQ to see OPR regarding her trip to Cartagena five years ago. *(Plaintiff initially believed this was about the FBI Irizarry criminal*

*investigation as dozens of people were being questioned by either the FBI, the Grand Jury or DEA OPR and it had leaked throughout the law enforcement community).*

39. During the interview, which OPR Inspector Uhl falsely claimed was only an administrative matter, Plaintiff was interrogated and learned for the first time about allegations made against her relating to her trip to Cartagena and time spent at Irizarry's home and his boat.

40. The following law enforcement people were in the room questioning Plaintiff…, DEA Inspector Brad Uhl, DEA Inspector Tracey Gardner, FBI Special Agent Kristine Passamore (*Irizarry Case Agent*) and an IRS Agent Criminal Investigation Division (*co-case agent investigating the Irizarry criminal case with the FBI*).

41. During the interrogation on January 25 2022, DEA OPR Inspector Brad Uhl was yelling at Plaintiff, attacked Plaintiff's character, integrity, Plaintiff's sexual orientation and gender. He, in front of others, ridiculed, harassed, demeaned, and embarrassed Plaintiff about her bisexual conduct with former AUSA Marissa Darden and her lactating breasts which naturally expressed her colostrum due to a recent pregnancy. In addition, the OPR investigator's internal investigation had purposefully and publicly disclosed private and sensitive information regarding Plaintiff's sexual orientation to harass, intimidate and embarrass Plaintiff.

42. Plaintiff learned that interviews conducted both pre and post her interview by OPR with other employees who were with the Plaintiff and involved in the same conduct were not harassed or ridiculed nor were they required to appear in HQ personally, nor were they subjected to similar interview tactics.

43. Plaintiff, almost immediately after her January 2022 interrogation, was then retaliated against, penalized, punished, and had her security clearance revoked her credentials and gun taken and was suspended indefinitely pending removal. Plaintiff was treated as, and

singled out as some sort of sexually immoral deviant accused of acting improper, labeled a criminal, drug user, and falsely accused of sexual misconduct (*sexual misconduct connotes a crime, a criminal act of sexual nature, non-consensual in nature*) ridiculed, harassed and embarrassed

44. In February 2022, Plaintiff was contacted by another OPR inspector alleging missing non-drug evidence.

45. Plaintiff was improperly labeled and accused as the person responsible for misplacing three cell phones and a fitness type band/watch, non-drug evidence.

46. SAC Raymond Donovan just happened to notice that a case three years past with non-drug evidence had not been properly accounted for. SAC Donovan initiated an OPR investigation directed at the Plaintiff leading to adverse personnel actions levied at Plaintiff in an attempt to "paper" manufacture additional charges to support the removal of the Plaintiff. Note: other than the false allegations made by Irizarry and Defendant's salacious representations and embellishments of what took place that night five years ago at a private dinner/pool party, Plaintiff had an impeccable stellar reputation, received outstanding evaluations every year, passed every random drug/screening test given (10) and was overall lauded for her work receiving several monetary awards from DEA/DOJ.

47. Plaintiff reported to her supervisor that immediately upon the arrest of the subjects in the specific case, Plaintiff along with another agent, brought the phones to the AUSA working the case who sent them to be analyzed by SDNY staff tech persons. (*This has been confirmed and the non drug evidence, fit bit watch, was later found in the group's unofficial cabinet/desk – OPR was notified of this but still chose to ignore it and blame the Plaintiff at the behest of senior management officials.*)

48. Plaintiff's acting supervisor (Kevin Galinas) interrogated her about the alleged missing non-drug evidence.

49. Plaintiff told Galinas she had been transferred and reassigned twice since then so he, the supervisor himself or an agent in the group, should have been doing the case status reports, not her because Plaintiff no longer (*for more than three years*) had access to those group case files due to Plaintiff's transfers out of the group. Plaintiff also reported same (see paragraph #47 above).

50. Despite notice, the supervisor ordered Plaintiff to contact the AUSA's office to see if he (*DOJ Attorney Adam Hobson, SDNY*) could remember or knew what the status was or where non-drug evidence was.

51. Plaintiff did so at his request however the AUSA Hobson said he didn't remember after being sent to be analyzed by SDNY Tech.

52. That supervisor, Kevin Galinas asked Plaintiff to forge the AUSA Hobson's signature on a form accounting for the three phones and watch – non drug evidence, stating 'just scribble the AUSA's name and we'll be done with it'.

53. The Plaintiff refused to take that directive and fraudulently (forge) sign the AUSA's signature on a document falsely accounting for the non-drug evidence. For the Plaintiff's refusal to carry out an illegal order, she was retaliated against and adverse disciplinary actions were commenced against her in retaliation. Plaintiff was subjected to another investigation for alleged misconduct, harassed, intimidated, solicited by her supervisory officer to commit a federal crime and had adverse disciplinary action take against it.

54. In February 2022, Plaintiff was called by OPR Inspector Keith Hart asking Plaintiff to come in to be interviewed. Plaintiff did so.

55. The inspector, perplexed during the interview when Plaintiff told him this matter was over three years old and 1,200 days past the 11-day reporting indicator. Note: Although Plaintiff knew she had a duty to report to OPR what Galinas had ordered her to do, she was fearful it would result in more retaliation. Plaintiff learned OPR either wittingly or unwittingly was being directed by a higher authority within DEA to find "dirt" on her to support their ongoing attempts at firing her.

56. Inspector Hart told Plaintiff not to worry and stated even if Plaintiff was found to be responsible in any way, it's an oral reprimand or at most a day off type of disciplinary matter. (*Despite notifying OPR and updating them of the circumstances, which clearly showed Plaintiff did nothing wrong, they chose to ignore it*). Fearful, Plaintiff kept her mouth shut

57. April 21, 2022 – Plaintiff is ordered by Supervisor and Acting ASAC Weiner to meet with outgoing SAC Foley and incoming SAC Tarentino. Not given any reason just a date of April 25, 2022 for meeting.

58. April 25, 2022, Plaintiff AP meets with SAC Tarentino, outgoing SAC Foley, and her supervisor. Plaintiff is put on administrative leave for ten (10) days; her security clearance is revoked (never provided any procedural due process and hearing pertaining to security clearance); her gun, badge and identification are taken from her and she is prohibited from entering office without an escort and only upon official duty order. Plaintiff, during this meeting is given a memorandum dated April 14, 2022 and told it's about allegations made against her while conducting the Irizarry criminal investigation and her conduct five years prior at Irizarry's home in Cartegena, CB.

59. On April 30, 2022, Plaintiff contacts her supervisor about returning to work as her ten day administrative disciplinary leave was to terminate.

60. On same date, April 30, 2022, Plaintiff's supervisor tells her per Foley and Tarentino "stay home till next step". Plaintiff is given no other explanation nor what "next step" means or references.

61. May 3, 2022, SAC Tarentino sends agents Ravi Baldea and a task force officer to Plaintiff's home and take her officially assigned government vehicle (OGV) and her official parking pass at the office.

62. All of May and June 2022, Plaintiff is left in limbo on ten-day administrative leave and prohibited from her work. During this period, Plaintiff learns that people within DEA are being told Plaintiff is going to be arrested or fired, she's a drug user and dealer, was tied into the criminal case and activities of Jose Irizarry, is corrupt, is a lesbian and sexual predator, sleeps with all the bosses in DEA and her boss' spouses and participate in group orgies with other DEA agents.

63. July 12, 2022, Plaintiff receives another memo and adverse action of an indefinite suspension without pay.

64. August 2, 2022, Plaintiff AP files a "mixed case" with her agency EEO office a complaint of workplace discrimination for violations of law, prohibited personnel practices and other discriminatory actions taken against her based upon her sex and sexual orientation. EEO Agency office designates case as a "mixed case" and commences action.

65. August 23, 2022, Plaintiff receives an official mandatory drug screening notice for her to appear on August 24, 2022, the next day, for her mandatory drug screening test which was randomly selected.