## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DANIELLE DREYER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | C.A. No.: 1:23-cv-09407-MKV |
| | : | |
| UNITED STATES DEPARTMENT | : | |
| OF JUSTICE, | : | |
| MERRICK B. GARLAND, as Attorney General of | : | |
| the United States Department of Justice, | : | |
| UNITED STATES DRUG | : | |
| ENFORCEMENT ADMINISTRATION | : | |
| And | : | |
| ANNE MILGRAM, as Administrator of the United | : | |
| States Drug Enforcement Administration | : | |
| Defendants | : | |

## AMENDED COMPLAINT (SECOND PRE-ANSWERS)

### Introduction

1.     The Plaintiff, Danielle Dreyer, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § et. seq., 42 U.S.C. §2000e-5 (Enforcement Provisions), 42 U.S.C. §2000e-16 and 42 U.S.C. 1981a, 28 U.S.C. §1367 and 28 U.S.C. §1391 to remedy acts of discrimination and other workplace (both work-related and unrelated) violations and other violations of law committed against her by the Drug Enforcement Administration (DEA), an Agency of the United States Department of Justice (DOJ).

### Jurisdiction

2.     This Court has jurisdiction over the subject matter of this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq., §2000e-5, §2000e-16. Additionally, Department of Justice (DOJ) Final Agency Decision issued September 8, 2023 sent

it's notice/right to file a civil suit in U.S. District Court to the Plaintiff conferring jurisdiction in this Court of its mixed case claims of discrimination and other violations of law rules or regulation.

## Venue

3.      Venue is proper in this judicial district under 42 U.S.C. §2000e-5(f)(3) in as much as the unlawful employment practices and discrimination complained of herein were committed in the Southern District of New York and because the aggrieved person, i.e. the Plaintiff, did work in the Southern District of New York and would have worked there but for the Defendant's unlawful employment practices and her illegal removal from her work.  Moreover, DOJ Final Agency decision not only confers jurisdiction but also confers venue in an "appropriate District Court" i.e. where the claims controversies and issues took place (see infra).

## Parties

4.      Plaintiff is 36 years old, is a citizen of the United States currently residing in the State of New Jersey.  The Plaintiff was employed by the DEA beginning January 29, 2023.  In April, 2023, Plaintiff was illegally removed from her position/job.  At that time, Plaintiff was employed by the DEA as a Special Agent, Series 1811, Criminal Investigator, Classification – Career Tenure Grp. 1 Grade Services (GS) 13 Step 4.

5.      The Defendant, DOJ/DEA, is a department within the executive branch of the United States Government along with its Agency (DEA) component.

6.      The Defendant, Merrick B. Garland, is the Attorney General of the United States and is being sued herein in his official capacity as attorney general.

7.     The Defendant, Anne Milgram is the Agency Head or Administrator of the DEA and is being sued herein in her official capacity as the DEA Administrator.

### Administrative Procedures

8.     Reference is made to the Plaintiff's letter motion along with its attached Exhibit 1 and Exhibit 2, *Reply to Defendant's Request for Pre Motion Conference dated March 6, 2024*.

9.     Plaintiff through counsel sets forth its position to Defendants' pleading in Doc. No. 30. The Plaintiff avers it has timely and properly commenced said action including the exhaustion of administrative remedies.

10.     Defendants filing within Doc. No. 30 is inaccurate, not complete, contains numerous "half truths" omitting material facts and context which instead of assisting this Court serves to mislead and confuse it.

11.     Defendant attempts to compartmentalize Plaintiff's administrative complaint(s) as two separate and independent complaints.  They are not.

12.      The unlawful acts of discrimination and violation of personnel laws were not separate and distinct.  They were a continuous extent, succession or whole, no part which can be distinguished from its neighboring parts; except by arbitrary division.

13.     Plaintiff has always propounded her claims (mixed case in nature) consisting of the same facts and circumstances as one in a continuum of events.  Moreover, even the original intake forms and correspondence provided by the administrative agencies themselves recognized and noted the claims were of a "mixed case" claim.

14. On June 24, 2022: Initial contact to file Agency EEO complaint (required step where employee informs designated Agency EEO contact person).

15. On July 19, 2022: Agency EEO representative initial interview (statement and case events were discussed and presented to Agency EEO officer.

16. On August 2, 2022: EEO official complaint filed.

17. In March 2023: Agency EEO office exceeds its 120-day limitation period prior to completion of its investigation and findings. "If a final decision by Agency EEO office is not issued within 120 days of the date of filing of the mixed case complaint, the complainant may appeal the matter to the MSPB at any time thereafter or may file a civil action … 29 CFR § 1614.302(d)(1)(i), mixed case complaints. (*Agency EEO counsel contacts Plaintiff's Counsel explaining their delay or dilemma and seeks 90-day extension from complainant. This request was denied due to the Agency's failure to interview and obtain statements from any of the identified responsible parties. Also note, at the inception of the Agency EEO case, Agency EEO officer spoke to Plaintiff's counsel and Plaintiff and candidly forewarned them that because most of the witnesses and identified responsible parties were senior managers at the Agency, it would be highly unlikely they would complete their investigation before the mandated time period [120 days]. When asked why, the Agency EEO official stated, its customary senior managers at the Agency don't want to be interviewed under oath or give statements despite their mandatory obligation to do so).*

18. On May 16, 2023: Refiled MSPB complaint – same facts and circumstances. Note: 120 days had lapsed. Agency EEO Office exceeded it 120-day limitation period. This was filed only to preserve Ms. Dreyer's rights pending Final Agency decision (FAD) and in the event EEO Office exceeds its 120-day limitation period. Both eventualities materialized and Plaintiff timely invoked her right to proceed with her appeal in the U.S. District Court, SDNY in accordance with the law.

19. September 8, 2023: DOJ-CAO issues its Final Agency Decision. Notice in FAD states claimant has a right to appeal her matter to Federal District Court by filing a civil action

within 90 days.  See FAD – Rights of Appeal Notice P.3 by Douglas Kern complaint adjudication officer.  (*See Attached Exh. #2*)

20.     October 25, 2023:  File civil suit Federal District Court (inside of 90 days per FAD, rights of appeal notice).   Plaintiff voluntarly dismisses her MSPB case and selects to pursue her action in Federal District Court by filing a civil action timely within the 90-day period).

## Facts

21.     The Plaintiff is a competitive service, career tenure Grp 1 status employee of the United States Justice Department, Drug Enforcement Administration (DEA), EOD January 29, 2012; post of duty New York Division, New York, NY.  Job series 1811, Criminal Investigator, Special Agent GS-13 Step 4.

22.     On or around September, 2017, Plaintiff, the aggrieved party (A.P.) was directed by her supervisor Mr. Aaron Koger to accompany him to attend a case related meeting in Cartagena, Colombia.

23.     While in Cartagena, Colombia, Plaintiff's supervisor introduced her to a friend and colleague of his, Mr. Jose Irizarry (*stationed in the Cartagena DEA Office*).  Plaintiff had never met nor worked with S/A Jose Irizarry previously.

24.     Sometime after work that day, Plaintiff was called by its supervisor Mr. Koger at Plaintiff's hotel.  Mr. Koger told Plaintiff. that Agent Jose Irizarry and his wife Nathalie had invited several DEA and other law enforcement colleagues to his house in Cartagena for dinner.

25.     At the dinner, a private social event, Plaintiff met Jose Irizarry's wife Nathalie. During the evening, Nathalie and Jose Irizarry made attempts to sexually seduce Plaintiff making passes, sexual suggestions, and innuendo.

26.     Sometime during the evening, while being sexually suggestive, Nathalie, unsolicited, placed a blue pill in Plaintiff's hand.  Plaintiff did not know what it was but believed at the time due to her sexual seductive behavior towards Plaintiff, it was viagra or some sort of sexual enhancement aid.

27.     Plaintiff never ingested the pill and discarded it when she, along with several others at the party, went into the pool and hot tub together.

28.     Plaintiff entered with her underwear as did others, most were nude and most if not all were drinking alcohol throughout the evening.  While in the hot tub talking with another woman, Marissa Darden, (*a federal prosecutor from Ohio*) they consensually kissed and embraced.  There were at least six persons together in the hot tub.

29.     A topic of conversation started relating to Plaintiff's leaking breasts as Plaintiff was lactating during that period of time (recent pregnancy); this conversation was normal, non-threatening and innocently brought on.  Plaintiff demonstrated by hand expressing her breast and showed the other women.

30.     They all (the invitees) stayed in the pool or hot tub and then Plaintiff left later in the evening escorted back to her hotel by her supervisor and another agent.

31.     The next day after work Plaintiff and several other invited guests went on Jose and Nathalie's boat, had some drinks, enjoyed the sunshine and sea air.

32.     Sometime during the outing on the boat, Plaintiff was again given a blue pill unsolicited by Jose Irizarry after coming out of the bathroom on the boat.

33.     Plaintiff discarded it under the seat covering of the boat and just went along with the banter.

34.     Plaintiff and the other guests all enjoyed the rest of the afternoon on the boat and returned after several hours.  Plaintiff and the other guests all chipped in for the fuel expense and left the marina.

35.     Plaintiff returned to her hotel accompanied by her supervisor.  Several agents were staying at the same hotel during that same time period.

36.     Plaintiff told her supervisor that Jose's wife was hitting on her making sexual passes at her the previous night and so was Jose, suggesting the three of them get together.

37.     Plaintiff, Plaintiff also told him she (Nathalie) gave her a blue pill and Jose did the same today on the boat while they were coming on to Plaintiff (making sexual advances).

38.     Plaintiff's boss laughed but then said, you didn't take it did you?

39.     Plaintiff told him no, I didn't, I didn't know what it was, it was blue.

40.     Plaintiff told him she didn't know what to do or how to act because they were his friends and he was being held out to be this sort of super-agent; everyone talked highly of him so she just went along, put the pill under the boat cushion she was sitting on and let the other one dissolve in the hot tub.

41.     Plaintiff's supervisor said don't worry about it, you did the right thing. I'll handle it.

42.     Plaintiff and her supervisor left Cartagena soon thereafter and returned to the office in New York.

43.     Plaintiff never heard a word about that night and afternoon on the boat at the Irizarry's until some five years later in January 2022.

44.    Plaintiff learned sometime between 2020 and 2022, unbeknownst to Plaintiff previously that Jose and Nathalie Irizarry were being investigated by the FBI, OIG, HSI and IRS for trafficking drugs and laundering money with some of Nathalie's relatives from Colombia.

45.    The FBI later arrested Irizarry and his wife and the U.S. Attorney's office in Florida indicted (sealed indictment) Jose and Nathalie Irizarry on February 21, 2020 (unsealed) and another individual, a DEA informant.

46.    Plaintiff was informed that publicly, the indictment of Irizarry was an embarrassment to DEA and remains a big scandal at DEA.

47.    Plaintiff learned Jose and Nathalie immediately began cooperating with the government and DEA for promises of leniency after pleading guilty to drug trafficking and corruption charges and continue to do so.

48.    The Plaintiff and dozens of DEA agents who came in contact with Jose Irizarry have been investigated.

49.    Plaintiff learned Mr. Irizarry and his wife, in attempts to get sentence reductions, have pointed the finger and informed on dozens of DEA agents, alleging they were criminals and it was those DEA agents who made him corrupt, taught him and conspired with him to steal, embezzle and laundered drug proceeds with him. *(See plea agreement statements and statements at pre-sentencing and sentencing of Jose Irizarry*.)  Not one DEA agent after five years of investigation has ever been charged, arrested or convicted of participating in any crime with Irizarry or his wife despite his claims.

50.    *From January 2022, that point at which OPR targeted Plaintiff, until her formal removal in April 2023, DEA OPR et. al, portrayed Plaintiff as some type of unethical, bad and*

*immoral sexual deviant. Plaintiff's character was defamed and OPR unjustly profiled her as a corrupt agent.*

51.    On January 25, 2022, Plaintiff was ordered to HQ to see OPR regarding her trip to Cartagena five years ago.  (*Plaintiff initially believed this was about the FBI Irizarry criminal investigation as dozens of people were being questioned by either the FBI, the Grand Jury or DEA OPR and it had leaked throughout the law enforcement community*).

52.    During the interview, which OPR Inspector Uhl falsely claimed was only an administrative matter, Plaintiff was interrogated and learned for the first time about allegations made against her relating to her trip to Cartagena and time spent at Irizarry's home and his boat.

53.    The following law enforcement people were in the room questioning Plaintiff…, DEA Inspector Brad Uhl, DEA Inspector Tracey Gardner, FBI Special Agent Kristine Passamore (*Irizarry Case Agent*) and an IRS Agent Criminal Investigation Division (*co-case agent investigating the Irizarry criminal case with the FBI*).

54.    During the interrogation on January 25 2022, DEA OPR Inspector Brad Uhl was yelling at Plaintiff, attacked Plaintiff's character, integrity, Plaintiff's sexual orientation and gender.  He, in front of others, ridiculed, harassed, demeaned, and embarrassed Plaintiff about her bisexual conduct with former AUSA Marissa Darden and her lactating breasts which naturally leaked due to a recent pregnancy.  In addition, the OPR investigator's internal investigation had purposefully and publicly disclosed private and sensitive information regarding Plaintiff's sexual orientation to harass, intimidate and embarrass Plaintiff.

55.    Plaintiff learned that interviews conducted both pre and post her interview by OPR with other employees who were with the Plaintiff and involved in the same conduct were

not harassed or ridiculed nor were they required to appear in HQ personally, nor were they subjected to similar interview tactics.

56.    Plaintiff, almost immediately after her January 2022 interrogation, was then retaliated against, penalized, punished, and had her security clearance revoked her credentials and gun taken and was suspended indefinitely pending removal.  Plaintiff was treated as, and singled out as some sort of sexually immoral deviant accused of acting improper, labeled a criminal, drug user, and falsely accused of sexual misconduct (*sexual misconduct connotes a crime, a criminal act of sexual nature, non-consensual in nature*) ridiculed, harassed and embarrassed

57.    In February 2022, Plaintiff was contacted by another OPR inspector alleging missing non-drug evidence.

58.    Plaintiff was improperly labeled and accused as the person responsible for misplacing three cell phones and a fitness type band/watch, non-drug evidence.

59.    SAC Raymond Donovan just happened to notice that a case three years past with non-drug evidence had not been properly accounted for.  SAC Donovan initiated an OPR investigation directed at the Plaintiff leading to adverse personnel actions levied at Plaintiff in an attempt to "paper" manufacture additional charges to support the removal of the Plaintiff.   Note: other than the false allegations made by Irizarry and Defendant's salacious representations and embellishments of what took place that night five years ago at a private dinner/pool party, Plaintiff had an impeccable stellar reputation, received outstanding evaluations every year, passed every random drug/screening test given (10) and was overall lauded for her work receiving several monetary awards from DEA/DOJ.

60.     Plaintiff reported to her supervisor that immediately upon the arrest of the subjects in the specific case, Plaintiff along with another agent, brought the phones to the AUSA working the case who sent them to be analyzed by SDNY staff tech persons.  (*This has been confirmed and the non-drug evidence, fit bit watch, was later found in the group's unofficial cabinet/desk – OPR was notified of this but still chose to ignore it and blame the Plaintiff at the behest of senior management officials.*)

61.     Plaintiff's acting supervisor (Kevin Galinas) interrogated her about the alleged missing non-drug evidence.

62.     Plaintiff told Galinas she had been transferred and reassigned twice since then so he, the supervisor himself or an agent in the group, should have been doing the case status reports, not her because Plaintiff no longer (*for more than three years*) had access to those group case files due to Plaintiff's transfers out of the group.  Plaintiff also reported same (see paragraph #47 above).

63.     Despite notice, the supervisor ordered Plaintiff to contact the AUSA's office to see if he  (*DOJ Attorney Adam Hobson, SDNY*) could remember or knew what the status was or where non-drug evidence was.

64.     Plaintiff did so at his request however the AUSA Hobson said he didn't remember after being sent to be analyzed by SDNY Tech.

65.     That supervisor, Kevin Galinas asked Plaintiff to forge the AUSA Hobson's signature on a form  accounting for the three phones and watch – non drug evidence, stating 'just scribble the AUSA's name and we'll be done with it'.

66.     The Plaintiff refused to take that directive and fraudulently (forge) sign the AUSA's signature on a document falsely accounting for the non-drug evidence.   For the

Plaintiff's refusal to carry out an illegal order, she was retaliated against and adverse disciplinary actions were commenced against her in retaliation. Plaintiff was subjected to another investigation for alleged misconduct, harassed, intimidated, solicited by her supervisory officer to commit a federal crime and had adverse disciplinary action take against it.

67.    In February 2022, Plaintiff was called by OPR Inspector Keith Hart asking Plaintiff to come in to be interviewed. Plaintiff did so.

68.    The inspector, perplexed during the interview when Plaintiff told him this matter was over three years old and 1,200 days past the 11-day reporting indicator. Note: Although Plaintiff knew she had a duty to report to OPR what Galinas had ordered her to do, she was fearful it would result in more retaliation. Plaintiff learned OPR either wittingly or unwittingly was being directed by a higher authority within DEA to find "dirt" on her to support their ongoing attempts at firing her.

69.    Inspector Hart told Plaintiff not to worry and stated even if Plaintiff was found to be responsible in any way, it's an oral reprimand or at most a day off type of disciplinary matter. (*Despite notifying OPR and updating them of the circumstances, which clearly showed Plaintiff did nothing wrong, they chose to ignore it*). Fearful, Plaintiff kept her mouth shut.

70.    April 21, 2022 – Plaintiff is ordered by Supervisor and Acting ASAC Weiner to meet with outgoing SAC Foley and incoming SAC Tarentino. Not given any reason just a date of April 25, 2022 for meeting.

71.    April 25, 2022, Plaintiff AP meets with SAC Tarentino, outgoing SAC Foley, and her supervisor. Plaintiff is put on administrative leave for ten (10) days; her security clearance is revoked (never provided any procedural due process and hearing pertaining to security clearance); her gun, badge and identification are taken from her and she is prohibited from

entering office without an escort and only upon official duty order. Plaintiff, during this meeting is given a memorandum dated April 14, 2022 and told it's about allegations made against her while conducting the Irizarry criminal investigation and her conduct five years prior at Irizarry's home in Cartegena, CB.

72. On April 30, 2022, Plaintiff contacts her supervisor about returning to work as her ten day administrative disciplinary leave was to terminate.

73. On same date, April 30, 2022, Plaintiff's supervisor tells her per Foley and Tarentino "stay home till next step". Plaintiff is given no other explanation nor what "next step" means or references.

74. May 3, 2022, SAC Tarentino sends agents Ravi Baldea and a task force officer to Plaintiff's home and take her officially assigned government vehicle (OGV) and her official parking pass at the office.

75. All of May and June 2022, Plaintiff is left in limbo on ten-day administrative leave and prohibited from her work. During this period, Plaintiff learns that people within DEA are being told Plaintiff is going to be arrested or fired, she's a drug user and dealer, was tied into the criminal case and activities of Jose Irizarry, is corrupt, is a lesbian and sexual predator, sleeps with all the bosses in DEA and her boss' spouses and participate in group orgies with other DEA agents.

76. July 12, 2022, Plaintiff receives another memo and adverse action of an indefinite suspension without pay.

77. August 2, 2022, Plaintiff, the aggrieved party (AP) files a "mixed case" with her agency EEO office a complaint of workplace discrimination for violations of law, prohibited

personnel practices and other discriminatory actions taken against her based upon her sex and sexual orientation. EEO Agency office designates case as a "mixed case" and commences action.

78.     August 23, 2022, Plaintiff receives an official mandatory drug screening notice for her to appear on August 24, 2022, the next day, for her mandatory drug screening test which was randomly selected.

79.     August 23, 2022, Plaintiff informs her legal counsel and is advised that such notice is an official mandate and she must appear for the examination and to notify her supervisory chain of command and follow all protocols.

80.     August 23, 2022, Plaintiff notifies her supervisor through her chain of command GS and Acting ASAC Weiner and Associate SAC Roberts that she has an official notice to appear and take her drug test the following morning between 10:00 and 11:00 am and she will be doing so in accordance with all rules and protocol with an escort from DEA, DEA supervisor Sara Dunlee.

81.     August 24, 2022, the Plaintiff receives notification from her supervisory command Associate SAC Roberts who reply's "go for it". A tacit authorization for her to appear and take the designated drug test.

82.     August 23, 2022, Plaintiff's escort DEA supervisor Sara Dunlea in compliance with all rules and procedures notifies her supervisory command ASAC who authorizes her to escort the Plaintiff into the building; during the test and then again out of the building following Plaintiff's mandated random drug screening examination.

83.     August 24, 2022, Plaintiff meets her supervisory escort Sara Dunlea outside DEA property. Supervisor Dunlea escorts the Plaintiff into the building and properly registers Plaintiff at reception, obtains the proper entry identification for Plaintiff and herself and escorts the Plaintiff to the examination. Plaintiff takes test and is immediately escorted off DEA property.

84.     On or about August 23, 2022, August 24, 2022, Plaintiff learns New York Division Counsel Michelle Warren and SAC Frank Tarentino were trying to prevent Plaintiff from taking her mandated drug test. The issue presented itself when New York Division Counsel communicated with DEA Headquarters counsel who advised New York "**it won't be good for our case if she passes her drug test**". This is a reference to ongoing disciplinary matters and litigation Plaintiff filed with EEO. The official was certain it was DEA New York Division Counsel and SAC Tarentino in discussion with DEA Headquarters counsel but was not certain who specifically the attorney at DEA Headquarters was (*note:    Jill McCann is the DEA Headquarters attorney assigned to pending DEA litigation against the Plaintiff*).

85.     Plaintiff learns on or around August 24, 2022, SAC Tarentino contacts DEA OPR trying to get OPR to take immediate action for misconduct against both Plaintiff and the supervisor Sara Dunlea who escorted her during the mandatory testing. The deputy inspector rebuffed SAC Tarentino's ill-conceived retaliation attempts telling him Plaintiff received an official order mandating her to appear for an official duty purpose to take a drug test and she was required to do so.

86.     September, 2022, Plaintiff learned that SAC Tarentino in yet another effort to retaliate against her for participating in a protected activity [federal employment and official duties] and for filing mixed case claim with EEO against the Defendant naming SAC Tarentino as one of the responsible parties, communicated with or attempted to communicate through

others with SAC of the Miami Field Division informing her that he had initiated an adverse personnel action against Sara Dunlea who had just recently been promoted and transferred to Miami Field Division. This communication was made in attempts at persuading Sara Dunlea's new boss, the SAC of Miami, to carry out some sort of punitive action against Sara Dunlea at the behest of Tarentino.

87. Tarentino retaliated against both Plaintiff and G/S Dunlea (Third Party) first by attempting to initiate a false/fabricated complaint of misconduct with OPR. The second act of retaliation Tarentino initiated, under false pretenses, an adverse personnel action against G/S Dunlee for escorting Plaintiff to take her drug test (protected activity/federal employment and official duties). A management review of Sara Dunlea was initiated on October 18, 2023 (ordered by SAC Tarentino and assigned to subordinates to conduct).

88. ASAC Todd Riley and ASAC Farhava Islam conducted the review directed by SAC Tarentino, ASAC Islam conducted herself in a hostile manner and asked questions of a confidential nature about Plaintiff's EEO and OPR case in an attempt to compel and solicit information from a potential witness in ongoing matters currently in litigation. Dunlea was inappropriately asked to violate DEA confidentiality policy pertaining to ongoing OPR internal investigations of other DEA Employees. Dunlea was also asked to participate or facilitate meddling/obstruction into ongoing legal matters (which were pending litigation before an official administrative body, DEA/EEO Office) at the directive of SAC Tarentino.

89. On December 19, 2022, G/S Sara Dunlea informed the Deputy SAC of NY about what had occurred in her management review meeting with ASAC Farhana Islam that she was harassed and retaliated against and questions asked were beyond the scope of a management review and felt it was payback retaliation for her escorting (as protocol required) Plaintiff to take

her random drug screening examination. DEA failed to take any corrective measures against responsible management to stop the retaliation and harassment..

90. On February 10, 2023, SAC Tarentino sends an emissary from his office to meet Plaintiff. Plaintiff is given a letter dated 1/25/2023 of proposed disciplinary action – removal and notice of the additional disciplinary personnel action taken against her (non-drug evidence issue from five years past in 2018) by the Defendant in retaliation.

91. In or around March 16, 2023, Plaintiff learns EEO Official investigation was never completed in the required 180-day period. DEA Attorney from EEO Adam Walker notified appellant's counsel of its failure to meet deadline.

92. On or about April 19, 2023, Plaintiff learns Defendant (OPR and other senior managers) withheld and omitted exculpatory evidence about Jose Irizarry and his wife which showed a clear pattern and practice of Jose and his wife providing blue pills to other DEA employees in attempts to seduce them into having sex with them together. DEA willfully attempted to obstruct, mislead and mischaracterize the conduct of the Plaintiff and her interactions with Jose and Nathalie Irizarry knowing that Jose and his wife had exhibited a pattern and practice of soliciting other DEA employees and associates with drugs to entice them into having group sex with them. DEA was aware of such predilection and predatory behavior long before the events described herein were alleged and took place. Plaintiff has learned at least two other persons who were preyed upon by Jose Irizarry and his wife before doing the same to Plaintiff in which DEA senior management investigated such and forwarded said reports of incident to OPR and DEA HQ. Nonetheless, DEA chose to obfuscate and cover up for its prior failure to address criminal activities of Irizarry. By doing so, it knowingly placed not only the Plaintiff in harms way, but numerous other employees.

93.     On April 26, 2023, Plaintiff receives Deciding Official's decision letter of Removal upholding all previous charges levied against her stemming from the 2017 dinner/pool event hosted by Jose and Nathalie Irizarry in Cartagena CB it includes an additional charge the defendant's levied against her during their six year investigation.

94.     On May 16, 2023, Plaintiff has her mixed case filed in MSPB under original jurisdiction pending final agency decision by U.S. Department of Justice CAO Civil rights division, U.S. Department o Justice (Plaintiff has lawful rights to pursue her mixed case claim either in MSPB or in an appropriate U.S. District Court, civil suit).  This filing was done for preservation purposes as there were designated limitation periods in which to file.

95.     On September 8, 2023, Plaintiff receives Final Agency Decision and Right to File in U.S. District Court.

96.     On or about October 16, 2023, Plaintiff learned a DEA official from Chief Council's Office contacted a witness, Sara Dunlea, who had information supporting Plaintiff claims of retaliation and her own potential claims of retaliation by SAC Tarentino.  Sara Dunlea felt intimidated by the official so much so that she believed it prudent to contact and retain a private attorney.  (SAC Tarentino, in concert with other senior DEA officials both known and unknown, attempted to obstruct and interfere with an official lawful administrative process [The Random Drug Screening Examination] (see paragraphs #65-72 infra for reference)).

97.     October 25, 2023, Plaintiff invokes her right and timely files the instant civil suit in an appropriate U.S. District Court, Southern District of NY  (SDNY).

98.     Defendants' actionable conduct complained of herein proximately caused Plaintiff to suffer grave and substantial pecuniary damages, including lost wages, bonuses, commissions, fringe benefits, vacation pay, as well as other pecuniary damages, now, and in the future.

99.     Defendants' actionable conduct complained of herein forced Plaintiff to suffer substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, emotional distress with resulting physical and emotional manifestations, loss of enjoyment of life, humiliation, embarrassment, adverse working conditions, offensive working conditions, abusive working conditions, stress anticipating the next confrontational incident of workplace harassment, and retaliation, despair regarding Plaintiff's inability to stop or limit the continuing workplace harassment and retaliation, fear and discomfort triggered by suffering a loss of income, fear regarding Plaintiff's ability to find new suitable employment, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

100.    The conduct of each Defendants warrants the imposition of statutory punitive or exemplary damages, because Defendants intentionally and maliciously and without justification or excuse subjected Plaintiff to discriminatory terms and conditions of employment, harassed Plaintiff because of her sex and illegally retaliated against Plaintiff for resisting sexual advances, thereby demonstrating each Defendants' reckless and callous indifference to Plaintiff's right to work in an environment free from unlawful gender discrimination, and demonstrating each Defendants' malice or ill will.

101.    Defendants stand jointly and severally liable to Plaintiff for her damages resulting from the Defendants' illegal and wrongful actions complained of herein.

## Count One

### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e
### Discrimination Based on Sexual Orientation

102.    The foregoing paragraphs are re-alleged and incorporated by reference herein.

103.    Plaintiff is bisexual and, therefore, she is a member of a protected class.  A person does not need to "label" their sexuality if they choose not to.  A person can identify or express their sexuality in whatever orientation they believe fits.  Sexual orientation and gender identity protections – While Title VII of the Civil Rights Act of 1964 doesn't explicitly mention sexual orientation or gender identity, a 2020 United States Supreme Court ruling determined that these classes are protected under the Acts Provisions Against Sex Discrimination.

104.    In or about January 2022, Plaintiff's employer learned that in September 2017, while she was off duty at a party that was not work-related, she had consensually kissed and embraced a woman named Marissa Darden, a federal prosecutor from Ohio, while in a hot tub with six other people, including several men.

105.    While in the hot tub, Plaintiff wore underwear with no top.

106.    Many of the people in the hot tub were completely naked, including several men.

107.    On January 25, 2022, Plaintiff was interviewed at the DEA HQ in Washington, DC, purportedly because of the DEA's investigation of Irizarry.

108.    However, during this interview OPR Senior Inspector Brad Uhl berated Plaintiff in the presence of others about her bisexual conduct with Darden, causing her to suffer great shame, humiliation, and embarrassment.

109.    Defendant did not treat similarly-situated heterosexual males the same way.

110. For example, upon information and belief, Uhl never interviewed in-person any heterosexual men that were naked in the hot tub, but rather, he merely asked them some questions over the phone about what transpired at the party.

111. Upon information and belief, Uhl never berated any heterosexual men that were naked in the hot tub for their conduct at the party.

112. Upon information and belief, DEA never took any adverse employment action specifically related to sexual conduct, behavior or orientation against any of the heterosexual men that were naked and physically touching one another in the hot tub and pool at the same party.

113. Plaintiff's conduct at the party while off duty at a non-work related event violated no DEA rules.

114. Nonetheless, following this interview, Plaintiff's co-workers began to ostracize her at the office by ignoring and shunning her.

115. Rumors began to circulate that Plaintiff was promiscuous and that she had "slept her way to the top."

116. Upon information and belief, Uhl has posted racist, sexist, and anti-LGBTQ comments on social media under the username "Brad Young."

117. Upon information and belief, Uhl is under investigation by the DEA for making racist, sexist and anti-LGBTQ comments on social media.

118. At all relevant times to this matter, Uhl was either a decision-maker or in a position to influence the decision-maker(s) relative to any discipline that could be issued to Plaintiff.

119. Despite Plaintiff's performance of her assigned job duties in an exemplary manner at all times during the course of her employment with Defendants, because of her sexual orientation, Defendants unlawfully revoked her security clearance and terminated her valuable employment in violation of 42 U.S.C. § 2000e et seq., and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs above.

**Count 2 (State Law Claim)**

**Violation of the Human Rights Law,**
**N.Y. Exec. L Ch. 18., Art. 15 § 290 et seq.**
**Discrimination Based on Sexual Orientation**

120. The foregoing paragraphs are re-alleged and incorporated by reference herein.

121. Plaintiff is bisexual and, therefore, she is a member of a protected class. A person does not need to "label" their sexuality if they choose not to; a person can identify or express their sexuality in whatever orientation they believe fits. Sexual orientation and gender identity protections – While Title VII of the Civil Rights Act of 1964 doesn't explicitly mention sexual orientation or gender identity, a 2020 U.S. Supreme Court ruling determined that these classes are protected under the Acts Provision Against Sex Discrimination.

122. In or about January 2022, Plaintiff's employer learned that in September 2017, while she was off duty at a party that was not work-related, she had consensually kissed and

embraced a woman named Marissa Darden, a federal prosecutor from Ohio, while in a hot tub with six other people, including several men.

123.    While in the hot tub, Plaintiff wore underwear with no top.

124.    Many of the people in the hot tub were completely naked, including several men.

125.    On January 25, 2022, Plaintiff was interviewed at the DEA HQ, Washington, D.C. purportedly because of the DEA's investigation of Irizarry.

126.    However, during this interview OPR Senior Inspector Brad Uhl berated Plaintiff in the presence of others about her bisexual conduct with Darden, causing her to suffer great shame, humiliation, and embarrassment.

127.    Defendant did not treat similarly-situated heterosexual males the same way.

128.    For example, upon information and belief, Uhl never interviewed in-person any heterosexual men that were naked in the hot tub, but rather, he merely asked them some questions over the phone about what transpired at the party.

129.    Upon information and belief, Uhl never berated any heterosexual men that were naked in the hot tub for their conduct at the party.

130.    Upon information and belief, DEA never took any adverse employment action specifically related to sexual conduct, behavior, or orientation against any of the heterosexual men that were physically touching one another in the hot tub and pool at the same party.

131.    Plaintiff's conduct at the party while off duty at a non-work related event violated no DEA rules.

132. Nonetheless, following this interview, Plaintiff's co-workers began to ostracize her at the office by ignoring and shunning her.

133. Rumors began to circulate that Plaintiff was promiscuous and that she had "slept her way to the top."

134. Upon information and belief, Uhl has posted racist, sexist, and anti-LGBTQ comments on social media under the username "Brad Young."

135. Upon information and belief, Uhl is under investigation by the U.S. Department of Justice, Office of Inspector General and DEA for making racist, sexist and anti-LGBTQ comments on social media.

136. At all relevant times to this matter, Uhl was either a decision-maker or in a position to influence the decision-maker(s) relative to any discipline that could be issued to Plaintiff.

137. Despite Plaintiff's performance of her assigned job duties in an exemplary manner at all times during the course of her employment with Defendants, because of her sexual orientation, Defendants unlawfully revoked her security clearance and terminated her valuable employment in violation of N.Y. Exec. L Ch. 18., Art. 15 § 290 et seq., and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs above.

## Count Three

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e**
**Discrimination Based on Sex**

138.     The foregoing paragraphs are re-alleged and incorporated by reference herein.

139.     Plaintiff is a female person and, therefore, she is a member of a protected class.

140.     In or about January 2022, Plaintiff's employer learned that in September 2017, while she was off duty at a party that was not work-related, she had consensually kissed and embraced a woman named Marissa Darden, a federal prosecutor from Ohio, while in a hot tub with six other people, including several men.

141.     At this time, Plaintiff had recently given birth to a child and her breasts were lactating.

142.     While in the hot tub, Plaintiff's breasts leaked due to her recent pregnancy.

143.     When Plaintiff was asked by a curious person in the hot tub why her breasts were leaking, she explained that she had recently given birth and demonstrated by expressing breast milk from one of her breasts.

144.     At this interview conducted by DEA Official – Senior Inspector Brad Uhl. Plaintiff was accused of engaging in deviant sexual behavior when she expressed breast milk while in the hot tub in September 2017.

145.     Plaintiff attempted to provide the proper context and backdrop behind the expressing of the breast milk, but Uhl did not want to hear an explanation.

146.    Instead, Uhl accused Plaintiff of engaging in deviant sexual behavior and berated her in the presence of others, causing her to suffer great shame, humiliation, and embarrassment.

147.    Upon information and belief, Uhl has posted racist, sexist, and anti-LGBTQ comments on social media under the username "Brad Young."

148.    Upon information and belief, Uhl is under investigation by the DEA for making racist, sexist and anti-LGBTQ comments on social media.

149.    At all relevant times to this matter, Uhl was either a decision-maker or in a position to influence the decision-maker(s) relative to any discipline that could be issued to Plaintiff.

150.    Despite Plaintiff's performance of her assigned job duties in an exemplary manner at all times during the course of her employment with Defendants, because of her sex, Defendants unlawfully revoked her security clearance and terminated her valuable employment in violation of 42 U.S.C. § 2000e et seq., and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs above.

**Count Four (State Law Claims)**

**Violation of the Human Rights Law,**
**N.Y. Exec. L Ch. 18., Art. 15 § 290 et seq.**
**Discrimination Based on Sex**

151.    The foregoing paragraphs are re-alleged and incorporated by reference herein.

152.     Plaintiff is a female person and, therefore, she is a member of a protected class.

153.     In or about January 2022, Plaintiff's employer learned that in September 2017, while she was off duty at a party that was not work-related, she had consensually kissed and embraced a woman named Marissa Darden, a federal prosecutor from Ohio, while in a hot tub with six other people, including several men.

154.     At this time, Plaintiff had recently given birth to a child and her breasts were lactating, which naturally leaked.

155.     While in the hot tub, Plaintiff's breasts leaked due to her recent pregnancy.

156.     When Plaintiff was asked by a curious person in the hot tub why her breasts were leaking, she explained that she had recently given birth and demonstrated by expressing her breast milk from one of her breasts.

157.     At this interview, Plaintiff was accused of engaging in deviant sexual behavior when she expressed breast milk in the hot tub in September 2017.

158.     Plaintiff attempted to provide the proper context and backdrop behind the expressing of the breast milk, but Uhl did not want to hear an explanation.

159.     Instead, Uhl accused Plaintiff of engaging in deviant sexual behavior and berated her in the presence of others, causing her to suffer great shame, humiliation, and embarrassment.

160.     Upon information and belief, Uhl has posted racist, sexist, and anti-LGBTQ comments on social media under the username "Brad Young."

161. Upon information and belief, Uhl is under investigation by the U.S. Department of Justice, Office of Inspector General and DEA for making racist, sexist and anti-LGBTQ comments on social media.

162. At all relevant times to this matter, Uhl was either a decision-maker or in a position to influence the decision-maker(s) relative to any discipline that could be issued to Plaintiff.

163. Despite Plaintiff's performance of her assigned job duties in an exemplary manner at all times during the course of her employment with Defendants, because of her sex, Defendants unlawfully revoked her security clearance and terminated her valuable employment in violation of N.Y. Exec. L Ch. 18., Art. 15 § 290 et seq., and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs above.


## Count Five

**(Federal Workplace Discrimination (Retaliation) in Violation of Title VII Civil Rights Act of 1964 42 U.S.C. §2000e-16)**

164. Plaintiff re-alleges and incorporates by reference each allegation contained in each aforementioned paragraphs as set forth herein.

165. The Defendant's conduct as alleged above constitutes discrimination based on retaliation. The Defendant through its actions retaliated against the Plaintiff for outwardly and publicly opposing the Agency and its executives for the unfair, improper and illegal actions taken

against her.  The retaliation exponentially increased once she filed an official complaint, an EEO discrimination claim.

166.    The Defendants began to act in concert to "pile on" or "paper" Plaintiff's alleged conduct.  Defendant's fabricated charges in efforts to terminate Plaintiff's employment.  Ray Donovan, Director of Operations, a senior manager from DEA self initiates an unrelated misconduct claim against the Plaintiff.  The Plaintiff learned this directly from a subordinate OPR official after he contacted her to inquire about Plaintiff's alleged failure to follow written directions related to the reporting of a non-drug evidence matter three years prior.  The Plaintiff informed the inspector of the circumstances surrounding the matter that during that period she was transferred.  The acting GS and subordinate agents in that group maintained the non-drug evidence as well as the reporting responsibilities.  The OPR Inspector was confused telling the Plaintiff he thought the matter was current, not three years old and also told the Plaintiff that the inquiries into the matter came directly from Ray Donovan, the Director of Operations.  The inspector told the Plaintiff that this investigation was BS and not to worry about it, he'd get back to her.  The Plaintiff never heard from the inspector again, however OPR submitted the charge of misconduct to the DEA Board of Professional Responsibility in which the report was referenced in the proposed recommendation for the termination and revocation of her security clearance.

167.    Plaintiff experienced other unrelated complaints during the investigation into her alleged misconduct from DEA/OPR, specifically the DEA/OPR New Jersey Office.  This inspector contacted the Plaintiff and told her that there was a claim for misconduct for which he was investigating.  He did not elaborate on the alleged misconduct and told the Plaintiff there was something amiss with the allegations, he wanted no part of fabricating claims of misconduct

against her to support DEA management.  That inspector told the Plaintiff he was immediately dismissing that specific allegation.

168.    DEA officials continued to attempt to "pile on" or "paper" allegations of misconduct including a new attempt reported by the Plaintiff and the Plaintiff's attorney.  DEA officials attempted to thwart a mandated governmental administrative process which had the likelihood and potential to have affected both this Court and the Plaintiff's right to adjudicate her claim through the judicial process.  Frank Tarentino, the SAC of NY and Michelle Warren, DEA NY Division Counsel, took actions to keep the Plaintiff from appearing and taking a mandated random drug screening examination ordered by DEA Headquarters.  Plaintiff learned that SAC Tarentino and DEA NY Division Counsel Warren were in communication with DEA Headquarters Chief Counsel's Office.  A communication took place amongst those individuals pertaining to whether or not they should let the Plaintiff take the required urinalysis drug screening examination or to stop her from taking it.   The individual attorney at DEA Headquarters opined [that if she (the Plaintiff) passed the drug screening test, it would not help their case any].  SAC Tarentino and DEA Division Counsel Michelle Warren, through others at DEA immediately began to intervene.  Those individuals at DEA took actions to obstruct her appearance and from being examined for the drug-screening test.  These actions included contact to the Associate SAC Keith Kruscall who was informed to instruct the Plaintiff not to enter the DEA building and if she attempted or came into the building, she would be trespassing and charged accordingly.   Tarentino and other DEA officials were demanding under threat and coercion that the Plaintiff disobey a lawful order or command from headquarters directing her to appear and be examined for the random drug screening examination.  Plaintiff, on the advice of counsel, was told to appear at the scheduled examination as it was an order from Headquarter

personnel HR Department at DEA and she was, at that time, still an employee even though she was suspended. The Plaintiff, as instructed by both her counsel and another ASAC at DEA NY Field Division, was to seek an escort with a supervisor, sign the visitor's log and have the supervisor announce at the front security desk that Plaintiff was there to take a random drug exam ordered by Headquarters. The Plaintiff followed this exact protocol. The Plaintiff's escort was Supervising Special Agent Sara Dunlea, who followed exactly, the directive implemented by her ASAC. The Plaintiff arrived timely as scheduled, was escorted to the examination, took the examination as directed and was escorted off the premises by the supervisor. SAC Tarentino learned that the Plaintiff was not stopped, arrested or charged upon entering the building. He became irate and called the security personnel in the building ordering them to seize and detain the Plaintiff. The Plaintiff, however, had already entered the building taken the exam as ordered by Headquarters and left the premises as instructed to do so.

169. Frank Tarentino continued his retaliatory actions against the Plaintiff by calling the Chief Inspector at OPR, DEA Headquarters demanding they open another misconduct investigation case against the Plaintiff and bring charges against her to include trespass. The Chief Inspector rebuffed Tarentino's attempt to have her investigated and charged for showing up at the NY Field Division and take the exam. The Chief Inspector informed SAC Tarentino that his attempts to do so were improper and that the Plaintiff was following an official directive issued from a higher authority at Headquarters and she was mandated to appear. Whether she was suspended or not, she was still an employee at that time.

170. SAC Tarentino, still fuming, continued with retaliatory acts against the Plaintiff, this time attacking the supervisor, Miss Sara Dunlea. SAC Tarentino ordered two subordinate senior managers within the NY Field Division to investigate Miss Dunlea. ASAC Farhanna

Islam and ASAC Todd Riley were ordered by Tarentino to investigate and charge the supervisor who escorted the Plaintiff to take her drug-screening test. ASAC Islam and ASAC Riley carried out Tarentino's orders under false pretenses against Sara Dunlea and took adverse personnel actions, including a fabricated management review, and disciplinary actions against her.

171.     Tarentino, Warren, Islam, Riley including Keith Kruscall, who later claimed he was unwittingly asked by Tarentino to carry out said actions, carried out improper and illegal personnel actions, some which can be construed and interpreted under the law as criminal obstruction and/or tampering with witnesses and evidence in an official government and administrative proceeding likely to be adjudicated in a formal judicial proceeding, SDNY District Court. These actions were carried out against the Plaintiff and against Sara Dunlea. The officials at DEA made it clear through their actions that it did not matter whether Sara Dunlea was simply and properly doing her job, if any other employee even associated with the Plaintiff, they would be attacked and retaliated against, sending a message to all employees, the Plaintiff is no good and we are getting rid of her one way or another - be careful because you are either with us or against us.

172.     The reasons for the Defendant's conduct were not for the Agency's claims or the purported reasons but instead the discrimination, retaliation, bias and violations of law were or contributed to or played a role in their employment decisions to revoke the Plaintiff's security clearance and terminate her employment. Plaintiff has suffered grave and substantial damages wherefore Defendant stands liable to Plaintiff for the damages as alleged.

## Count Six

**(Violation of Law, Rule or Regulation, 5 U.S.C. §2302 (b)(1)(A), Prohibited Personnel Practice, Discrimination (Disciplinary Action, Removal))**

173.    The foregoing paragraphs are re-alleged and incorporated by reference herein.

174.    The reasons for the Defendant's conduct were not the true reasons, but instead the discriminatory aspect of the Defendants' unlawful activity either contributed to, was a factor in, or played some role in the Agency's decision to revoke her security clearance and terminate her employment.

175.    Prohibited Personnel Practices codified at 5 U.S.C. **§2302** specifies that Agency officials, in the instant matter – DEA, are not permitted to discriminate, consider improper recommendations, coerce political activity, obstruct competition or engage a candidate to withdraw from competition, grant a preference not authorized by law, engage in nepotism, retaliate for the exercise or a grievance or appeal right, knowingly violate the preference rights of a veteran, or engage in other actions that would violate a law, rule or regulation that implements the merit system principles of federal employees.

176.    Defendant, through its actions, discriminated against the Plaintiff and engaged in other actions that violated the law.  Plaintiff was harassed, demeaned, humiliated and bullied. She had her security clearance revoked and was terminated from her employment because she was acting or behaving bisexually and not in conformance with DEA's preconceived notions to how a woman should be behave and how a man should behave sexually or romantically because Plaintiff was kissing and embracing another woman, Marissa Darden, a AUSA from the Northern District of Ohio, at a private party, off duty.  Marissa Darden, at the time, was nominated by the Biden Administration to become the United States Attorney for the Northern District of Ohio.

She received bipartisan support for the Presidential appointment only to be bullied and intimidated by DEA et. al. into removing her name from consideration. These actions caused irreparable harm to her career.

177. Sara Dunlea, a supervisor carrying out her authorized duties, was retaliated against and adverse personnel actions were taken against her for escorting the Plaintiff to conduct a lawful and required job-related task. Defendants, those identified and those yet to be identified, engaged in prohibited personnel practices by taking adverse personnel actions against the Plaintiff and others. These same actions harmed the Plaintiff and other women, specifically Marissa Darden and Supervisory Special agent Sara Dunlea.

178. The reasons for the Defendants' conduct were not for the Agency's claimed or purported reasons but instead the discrimination, bias, retaliations and violations of law were or contributed, or played a role in their employment decisions.


## Count Seven

**(Violation of law, rule or regulation or policy - 5 U.S.C. §2302(b)(4) Prohibited Personnel Practice, Obstruct Right to Employment)**

179. The foregoing paragraphs are re-alleged and incorporated by reference herein.

180. The Defendant's conduct as alleged above constitutes a violation of law, rule or regulation which violates actions taken to willfully obstruct or interfere in a person's right to employment.

181.     The reasons for the Defendant's conduct is not the true reasons but instead were the Defendants' unlawful conduct which contributed to, was a factor in or played a role in the Agency's decision to revoke Plaintiff's security clearance and terminate her employment.

182.     The Defendants' conduct constitutes a violation, law, rule or regulation by willfully instructing and interfering with the Plaintiff's right to employment and denying procedural due process rights.  Defendants, specifically Anne Milgram and the DEA attorney from Headquarters, working under her direction, took actions to manipulate and control the constitutional safeguards designed to provide and protect an employee's procedural due process rights.  These actions were effectuated by usurping the independent and autonomous decision making of the Deciding Official's office and the Deputy OPR Inspector's Office of Security Programs at DEA Headquarters.  These offices are by statutory authority, designed to render final decisions and security clearance decisions free from outside influence or control.

183.     During the investigative phase of the allegations into the Plaintiff, Matthew Germanowski served as the Senior Deciding Official for DEA.  The Deciding Official has statutory authority to make independent and autonomous decisions designed by Congress to protect the constitution and due process rights of federal employees.

184.     During the period in question, a DEA attorney from Headquarters, hired under special authority by Anne Milgram, approached Matthew Germanowski, the Deciding Official about an official case matter (unrelated) and requested that Germanowski change his final decision on an official case.  The Headquarters attorney claimed the request came from the "top", Anne Milgram the DEA Administrator.  The attorney, after being scolded by Germanowski as to the inappropriateness of his request, especially as an attorney, was told "no" by Germanowski. Germanowski went on to tell this DEA attorney that such conduct was unprofessional, illegal,

risked the entire Agency's credibility and its lawful ability designated to it by Congress through OPM to adjudicate employee conduct and related matters.

185. The attorney became conciliatory after he got caught asking Germanowski to do something inappropriate or illegal. When the attorney got a refusal, the attorney stepped back, claimed ignorance saying he wasn't sure if it was proper but thought he would ask anyway because it came from the "top" inferring from Anne Milgram.

186. Germanowski knew that would not be the end of it and shortly thereafter he was asked to leave his position. As a conciliatory gesture, in hopes Germanowski did not expose the inappropriate request, he was offered to "pick a closet at headquarters" and if not, resign.

187. Matthew Germanowski refused to be bullied, does not cave from the demands of the Agency attorney and Milgram and retired. (Germanowski would have been the designated D.O. had he not been forced to leave the position.)

188. Germanowski, prior to leaving the Agency, informed several persons both inside and outside DEA what transpired and that he was upset and disappointed. He was exposing this in efforts to let others know what was happening at senior executive level and how the Agency was violating employees' civil rights protections and due process rights. At that time, Germanowski told individuals he would not "out" the attorney by name because he believed it would hurt his chances or affect his ability to obtain a government contractor job that was contracted to provide work for the DEA. Germanowski was aware top DEA officials were the ones who called the shots and gave the thumbs up or down on contracting jobs and opportunities. Germanowski, not happy by being bullied or having a cloud of intimidation hanging over him, made it abundantly clear to individuals that if this ever did get exposed and he happened to be "subpoenaed" he would gladly tell the truth and the whole story.

189.     DEA officials, those identified above and those still yet to be identified, violated 5 U.S.C. **§2302(b)(4),** the Laws, Rules and Regulations outlining the Merit Systems Protections afford to federal employees.  Additionally, there are other violations of law, some which could be construed as criminal which have violated the Plaintiff's rights.  The harm experienced extends beyond this Plaintiff to persons such Matthew Germanowski, although "voluntarily retired" on paper, he was in reality constructively discharged and removed.  The actions of these Agency individuals continues to harm untold numbers of DEA employees who at least since the period of the Plaintiff's case continue to be denied their constitutional and procedural due process rights afforded to them under the law.

190.     These same DEA officials, through others, took the same or similar actions with the Deputy Chief Inspectors at the Security Programs Office where they were instructed to revoke security clearances later refusing to provide full procedural due process and hearings for those reasons.

191.     Although it is partially true that this District Court has limited authority or jurisdiction to hear matters pertaining to the issuance or revocation of national security clearances, it is false and misleading for the government to tell this Court or any judicial or tribunal officer that they have none.  It is clear that the U.S. Courts have full jurisdiction over constitutional matters including procedural due process matters.  DEA officials violated those constitutional rights of the Plaintiff by not allowing procedural due process in a hearing, i.e. notice and the right to be heard.  There is statutory authority issued in the National Security Adjudicative Guidelines which allow for a procedural due process rights and adjudicating national security clearance matters.  DEA violated the laws, rules and regulations which were given authority by Congress in the National Security Act of 1947 as amended in the Intelligence

Reform and Terrorism Prevention Act of 2004 (IRTPA) as amended in Executive Order (EO) 10450, Security Requirements for Government Employment, as amended EO 12968, Access to Classified Information, as amended; EO 13467, Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information; EO 13549. See Security Executive Agent Directive 4, Effective 8 June, 2017.

192.    The reasons for the Defendants conduct were not for the Agency's claimed or purported reasons or the good of the service but instead violation of the aforementioned laws, rules or regulations which contributed to or played a role in their employment decisions including the obstructive actions and interference with the Plaintiff's procedural due process at both offices, the Deciding Official Office and the Office of Security Programs. Their independent and autonomous decision making abilities were interfered with, manipulated and controlled by top agency officials at DEA, many of them who had clear conflicts and were notified as such as they were named as responsible parties previously in the administrative phase for violating the Plaintiff's rights.

## **Count Eight**

**(Violation of law, rule or regulation, 5 U.S.C. §2302(b)(9)(A), Prohibited Personnel Practice (Taking Personnel Action Against Employee for Exercising a Legal Right to File an EEO Claim)**

193.    The foregoing paragraphs are re-alleged and incorporated by reference herein.

194.    The Defendant's conduct as alleged constitutes a violation of law, rule or regulation which prohibits the taking of a personnel action against an employee because of the

employee exercising a legal right to make an EEO claim, exercise any appeal, complaint, grievance or right granted by any law, rule or regulation.

195. The Defendant, through its actions, retaliated against the Plaintiff by stepping up its efforts to discredit her integrity, character, work performance and work product. Plaintiff learned from a senior DEA official in New York that she was only going to receive a suspension with time off, perhaps several months. However, when the Plaintiff began to defend herself and made claims of discriminatory actions in violation of rules, regulations and laws, the Agency and its officials immediately began "papering" and "piling on"; fabricating facts to bolster their position, manipulating witnesses to lie about what they may have seen, heard or witnessed and spread rumors and innuendo maligning the Plaintiff's personal character, integrity and work performance.

196. Defendants commenced collateral inquiries and investigations going back in time over longer periods in efforts to find flaws in the Plaintiff's work performance and conduct so they could add charges to the current alleged misconduct claims surrounding the private party event. This event by itself was severely lacking evidence, the claims were incredulous or tenuous at best, see facts reference-Donovan and non-drug evidence; OPR investigator's inquiry regarding other unsubstantiated claims that mysteriously arose at the same time; Tarentino, Warren and other individual's attempt to obstruct an official process, interfere/tamper with witnesses pertaining to the Plaintiff's random drug screening exam; DEA officials retaliation against Sara Dunlea, Marissa Darden and Mattew Germanowski.

197. Defendants, by and through the aforementioned actions, improperly inflated and enhanced both the charges levied against the Plaintiff and punishment from temporary suspension to revocation of her security clearance to termination of her employment.

198.     The reasons for the Defendants' conduct were not for the Agency's claims or purported reason but instead the "other retaliation" as enumerated in 5 U.S.C. §2302(b)(9).  Such actions contributed to or played a role in their employment decisions.

<u>**Count Nine**</u>

**(Violation of law, rule or regulation, 5 U.S.C. §2302(b)(9)(B), Prohibited Personnel Practice (Taking Personnel Action Against an Employee a Third Party Testifying or Assisting an Employee Exercise a Legal Right or Claim)**

199.     The foregoing paragraphs are re-alleged and incorporated by reference herein.

200.     The Defendant's conduct as alleged constitutes a violation of law, rule or regulation which prohibits the taking of a personnel action against an employee or a third party testifying or assisting an employee exercise a legal right or claim.

201.     The reasons for the Defendant's conduct were not the true reasons but instead contributed to, were a factor in, or played in the Agency's decision to take adverse personnel actions.

202.     Defendants, by taking prohibited personnel actions against Sara Dunlea, an employee of the Agency, also a third party, who assisted the Plaintiff in exercising a legal right to wit - her employment.  Sara Dunlea escorted the Plaintiff to be examined (as ordered by DEA HQ/HR) for a randomly drug screening examination.

203.     Defendants Frank Tarentino, Michelle Warren, DEA Attorney HQ Farhanna Islam, Todd Riley and Keith Kruskall were some of the identified DEA management officials

who were responsible. They were working in concert or on behalf of DEA attorneys at Headquarters and senior management in efforts to remove/terminate the Plaintiff's employment and to intimidate, harass, persecute and bully Sara Dunlea who was also penalized and disciplined.

204. Tarentino through others continued the retaliation by attempting to contact the SAC in Miami (Sara Dunlea had to transfer to Florida) in efforts to get the Miami SAC to believe Sara Dunlea was a malcontent and to scrutinize her work and promotion in Florida.

205. It was learned the Miami SAC dismissed Tarentino's efforts to besmirch Miss Dunlea's character, integrity or work effort and the Miami SAC took no part in Tarentino's attempts to further retaliate or punish Miss Dunlea.

206. Sara Dunlea, already being punished and adversely affected by Tarentino's retaliation, continued to be leery such retaliatory acts would continue; more so after she was contacted by DEA Chief Counsel's Office, Attorney Jill McCann. The attorney questioned her in a manner Dunlea felt was odd and improper. The attorney was trying to sway her into an answer making a statement that was not accurate, would be misleading or less than candid.

207. Sara Dunlea was so uncomfortable by the contact from this attorney, she believe that if she told the truth about the random drug screening incident, she would be attacked for not being a team player. Sara Dunlea, in an abundance of caution, immediately retained private counsel after her call with the DEA attorney as she felt intimidated and she fears further retaliatory actions and harassment against her will continue because she is a witness to the true events which occurred and the Agency wants to silence her.

208. The reasons for the Defendant's conduct were not for the Agency's claimed or purported reasons but instead were those actions which violated laws, rules or regulations

outlined in 5 U.S.C. §2302(b)(9)(B), the discriminatory aspects of the Defendants actions contributed to, was a factor or played a role in their employment decisions.

## Count Ten

**(Violation of law, rule or regulation, 5 U.S.C. §2302(b)(9)(D), Prohibited Personnel Practice-Taking Personnel Action Against an Employee for Refusing to Obey an Order that Would Require the individual to Violate a Law, Rule or Regulation)**

209. The foregoing paragraphs are re-alleged and incorporated by reference herein.

210. The Defendant's conduct as alleged constitutes a violation of law, rule or regulation which prohibits taking a personnel action against an employee for refusing to obey an order that would require the individual to violate a law, rule or regulation.

211. The reasons for the Defendant's conduct were not the true reasons but instead contributed to, were a factor in, or played a role in the Agency's decision to take adverse personnel actions.

212. The Defendants' actions taken against the Plaintiff by interfering and wrongfully trying to keep her from carrying out a lawfully ordered mandate – to appear and submit to a random drug screening exam ordered by DEA Headquarters and the continued conduct threatening adverse action and prosecuting such actions against the Plaintiff and other employees (Sara Dunlea) for disobeying Tarentino's orders to disobey an official DEA Headquarters order and directive.

213. Additionally, DEA's conduct, specifically the conduct where her supervisor ordered her to forge the signature of the AUSA at the Southern District of New York to account

for non-drug evidence.  The Plaintiff refused to follow that directive or illegal order and the Plaintiff was retaliated against by DEA.

214.    The reason for the Defendants' conduct were not for the Agency's claimed or purported reasons but instead those actions were taken against the Plaintiff for refusing to obey an order that would require her to violate a law, rule or regulation.  The discriminatory aspect of the Defendants' action and conduct contributed to, was a factor in or played a role in their employment decisions.

## Count Eleven

**(Violation of Law, Rule or Regulation, 5 U.S.C. §2302(b)(10), Discriminate Against an Employee for Conduct Which Does Not Adversely Affect the Performance of the Employee or Others)**

215.    The foregoing paragraphs are realleged and incorporated by reference herein.

216.    The Defendant's conduct as alleged above constitutes a violation of law, rule or regulation which discriminates against an employee on the basis of sex and sexual orientation, for conduct which did not adversely affect the performance of the employee or others.

217.    The reasons for the Defendant's conduct were not the true reasons but instead contributed to, were a factor in, or played a role in the Agency's decision to take adverse personnel action.

218.    The Defendant, by its actions, wrongfully terminated Plaintiff from her employment and revoked her security clearance for alleged misconduct; conduct which took place off duty, was not work-related and in a private setting and had no adverse affect on her work performance or the performance of others.  It was not a public setting and the gathering

was never known publicly or addressed publicly bringing ill repute to the agency as alleged. No one even knew about the gathering until DEA itself reported it five years later. It was eventually leaked to the press.

219. Brad Uhl, who conducted the investigation of the Plaintiff for alleged misconduct embellish, distorted and fabricated the facts.

220. Uhl et. al manipulated witnesses and their statements during the investigative process. He then misrepresented and misreported those facts in official agency reports. Uhl was in a unique position to make decisions about prosecuting the allegations against the Plaintiff for which a report and communications were made to decision makers in efforts to influence them relative to discipline issued to the Plaintiff.

221. Uhl fabricated and molded the facts making what was a privately held, by invitation, late night party amongst friends and associates at a private home into a public orgy of prurient interest which damaged DEA's public perception. Uhl also misstated and misrepresented facts about the alleged conduct including false allegations about the Plaintiff's use and possession of illegal drugs for which there was either contradictory evidence in official statements made by witnesses who were interviewed by Uhl or no evidence at all.

222. The reasons for the Defendants' conduct, terminating the Plaintiff's employment among other actions taken were not the true reasons but instead discrimination, bias, discriminatory animus and violations of law contributed to, were factors, or played a role in their employment decisions.

## Count Twelve

**(Federal Workplace Discrimination Sex (Sexual Orientation) in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16)**

223. The foregoing paragraphs are re-alleged and incorporated by reference herein.

224. The Supreme Court held that firing individuals because of their sexual orientation or transgender violates Title VII Prohibition on Discrimination because of Sex. See *Bostock v. Clayton County, GA, No. 17-1618 (S.CT. June 15, 2020). "Discrimination based upon homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second" see also, id. (S. CT. June 15, 2020).*

225. The Defendant's conduct as alleged herein constitutes discrimination retaliation based upon the sex and sexual orientation.

226. DEA officials specifically, OPR Inspector Brad Uhl disseminated falsehoods and rumors during his investigation throughout DEA defaming the Plaintiff and labeling her as a promiscuous sexual deviant among other things. These falsehoods spread throughout DEA which lead the Plaintiff to being ostracized by her peers, colleagues and supervisors both male and female.

227. The Plaintiff, long before the investigation for alleged misconduct was completed, experienced gender and personal harassment related to her sexual orientation. Unsuitable comments about her sexual orientation were made, remarks were made about alleged promiscuity that she slept her way through the Agency with different supervisors, etc. Her work environment was a place of constant insults and insinuations. She felt bullied and harassed. She began to feel intimidated and bullied by supervisors who started to "pile on" or "paper" a case against her for misconduct, discrediting her work, attempting to go back in time looking for missteps or faults in her work. One example is when a senior manager attempted to wrongfully place blame on her for an administrative evidence reporting matter. These were attempts to

make up more potential disciplinary issues for which the Plaintiff could be charged with and eventually fired. The Plaintiff experienced several other attempts mentioned in the aforementioned facts where DEA officials tried to "pile on" charges wholly unrelated to their investigation in efforts to bolter and garner additional support to justify revoking the Plaintiff's security clearance and terminate her employment.

228. The reasons for the Defendants' conduct leading to the Plaintiff's termination among other adverse actions taken were not the true reasons but instead discriminatory animus, bias and violations of law which contributed to, were a factor or played a role in their employment decisions. The Defendants' discriminatory animus for employees who are LBGTQ, and or with dissimilar sexual orientation continued throughout the investigation up to and including Plaintiff's security clearance being revoked and termination of her employment because DEA did not believe Plaintiff's conduct or actions (the consensual bisexual (*LBGTQ*) embrace and kissing of another woman) conformed to DEA's stereotypes about the way men or women are expected to behave.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DANIELLE DREYER prays that the Court grant the following relief:

229. An order directing Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendants' discriminatory treatment of Plaintiff, and make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant's discriminatory treatment, including, but not limited to, wages and employment benefits.

230. A finding that the Defendants stands joint and severally liable to make Plaintiff whole for all damages suffered as a result of the wrongful acts and omissions alleged in each Count

herein, including inter alia damages for emotional harm, back pay, and front pay, and the value of lost fringe benefits;

231.    A finding that the Defendants stand joint and severally liable to Plaintiff for the imposition of statutory exemplary or punitive damages, because Defendants intentionally and maliciously and without justification or excuse illegally discriminated against Plaintiff on the basis of her sex, thereby demonstrating Defendants' reckless and callous indifference to Plaintiff's right to work in an environment free from unlawful discrimination, and demonstrating Defendants' malice or ill will;

232.    An order declaring that the acts and practices complained of herein are in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;

233.    A permanent injunction against Defendants prohibiting future acts of discrimination against Plaintiff and similarly-situated employees;

234.    An order enjoining and permanently restraining Defendants from further violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq

235.    An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

236.    An award of $500,000 for emotional pain and suffering;

237.    An award of $500,000 for damage to reputation;

238.    A finding that Defendants stand joint and severally liable to Plaintiff for an award of her reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-trial hearing to determine the amount of Plaintiff's reasonable attorneys' fees taxable to Defendant, along with a determination of Plaintiff's litigation costs and expenses taxable to Defendant;

239. An appropriate award of pre-judgment interest at twelve percent (12%) per annum on all sums recovered; and

240. Such other and further relief as this Court deems just and proper.


**JURY DEMAND**


241. Plaintiff requests trial by jury on all claims so triable.

> Respectfully submitted,
> this 22th Day of April, 2024
> Plaintiff, Danielle Dreyer
> By her Attorney
>
> /s/ Raymond Mansolillo
>
> Raymond Mansolillo Esq.
> Main Office
> One Marina Park Drive, Suite 1410
> Boston, MA 02210
> Tel. 401.640.4225
> Email. rmansolillo@cox.net
>
> Satellite Office:
> 14 Wall Street, FLR 20
> New York, 10005

**CERTIFICATE OF SERVICE**

I certify that the aforementioned complaint was filed electronically via ECF on April 22, 2024.

*/s/ Raymond Mansolillo*

Raymond Mansolillo