

# MERIT SYSTEMS PROTECTION BOARD

*Please type or print legibly.*                                            OMB No.

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

 # MERIT SYSTEMS PROTECTION BOARD

## Appeal Form--Appellant and Agency Information

*Please type or print legibly.*

**HEARING: You may have a right to a hearing before an administrative judge. If you elect not to have a hearing, the administrative judge will make a decision on the basis of the submissions of the parties. Do you want a hearing?**

12. Do you want a hearing? ☑ Yes ☐ No

**E-Filing: Registration as an E-Filer enables the appellant to file any or all of his/her pleadings with the Board in electronic form. Registration also means he/she consent to accept service of all pleadings filed by other registered E-Filers and all documents issued by the Board in electronic form. he/she will receive these as PDF documents at the e-mail address you provided the Board. If registered as an E-Filer, he/she may file any pleading, or portion of a pleading, by non-electronic means. The appellant can withdraw his/her registration as an e-filer at any time.**

13. Do you wish to register the appellant as an E-Filer in this appeal?

☑ Elect to E-file for appellant ☐ Decline to E-file for appellant

14. **I certify that all of the statements made in this form and all attached forms are true, complete, and correct to the best of my knowledge and belief.** ☐

**Raymond Mansolillo Esq, Appellant's Representa** **Date:**

Appeal Number: **202302197**

Submission Date: **5/16/2023 4:49:03 PM**

Confirmation Number: **219042**



# MERIT SYSTEMS PROTECTION BOARD

A representative helps and counsels a party in the preparation, presentation, or defense of the case. The representative appears with, or for, the party at hearings, settlement discussions, teleconferences, or other proceedings before the Board. The representative does not have to be an attorney. You may proceed without a representative and represent yourself. You may use this form to designate an organization or a person who has agreed to represent you in your case before the Board. **If you are representing yourself, you do not need to fill out this form.** (The Board's regulations on representatives are found at **5 CFR 1201.31.**) By designating a representative, you agree to allow the Board to give your representative all information concerning the appeal.

The address and telephone number of the representative must be correct so that all communications are received on time by the representative. **Any changes of this designation must be sent in writing to the MSPB office handling the case and to the other party.**

**If you file this designation WITH your appeal, the Board will send a copy of the designation, along with a copy of your appeal, to the other party. If you file this designation AFTER you have filed your appeal, you MUST send a copy to the other party and you MUST send proof to the Board that you have sent a copy to the other party.**

*Please type or print legibly.*                                                                 OMB No.

**DESIGNATION:** The individual or organization named below is hereby designated to represent:

NAME AND ADDRESS OF APPELLANT:

"I hereby designate _____ to serve as my representative during the course of this appeal. I understand that my representative is authorized to act on my behalf. In addition, I specifically delegate to my representative the authority to settle this appeal on my behalf. **I understand that any limitation on this settlement authority must be filed in writing with the Board.**"

Service Method for Representative :

**Please send this form with your appeal if you are designating a representative. If you do so after you have filed your appeal, send this form to the Board office where your appeal is pending, and provide a copy to the other party. Board regulations require that all copies of your communications with the Board after an appeal has been filed be served on the other party.**

MSPB Form 185-4 (          )



# MERIT SYSTEMS PROTECTION BOARD

## Appeal of Agency Personnel Action or Decision (Non-retirement)

**Complete this form and attach it to MSPB Form 185-1 if you are appealing an agency personnel action or decision (other than a decision or action affecting your retirement rights or benefits) that is appealable to the Board under a law, rule, or regulation. If the personnel See 5 CFR 1201.3(a) for a list of appealable personnel actions and action or decision is appealable to the Board, you should have received a final decision letter from the agency that informs you of your right to file an appeal with the Board.**

*Please type or print legibly.* OMB No. 3124-0009

**Please submit only the attachments requested in this form at this time.** You will be afforded the opportunity to submit detailed evidence in support of your appeal later in the proceeding.

**Name** *(last, first, middle initial)* Dreyer, Danielle

1. Check the box that best describes the personnel action or decision taken by the agency you named in MSPB Form 185-1 that you are appealing. (If you are appealing more than one action or decision, check each box applies.)

- ☐ Veterans Administration Senior Executive Service Removal from civil service
- ☐ Veterans Administration Senior Executive Service Transfer to general schedule
- ☑ Removal (Termination after completion of probationary or initial service period)
- ☐ Involuntary Resignation
- ☐ Termination during probationary or initial service period
- ☐ Involuntary Retirement
- ☐ Reduction in grade or pay
- ☐ Suspension for more than 14 days
- ☐ Separation, demotion, or furlough for more than 30 days by reduction in force (RIF)
- ☐ Furlough of 30 days or less
- ☐ Denial of within-grade increase
- ☐ Failure to restore/reemploy/reinstate or improper restoration/reemployment/reinstatement
- ☐ Negative suitability determination
- ☐ Other action or decision (describe):

2. Date you received the agency's final decision letter (if any) (month, day, year) (Attach a copy)

04/27/2023

3. Effective date (if any) of the agency action or decision (month, day, year)

04/26/2023

4. Prior to filing this appeal, did you and the agency mutually agree in writing to try to resolve the matter through an alternative dispute resolution (ADR) process?

☐ Yes ☑ No

5. Explain briefly why you think the agency was wrong in taking this action. In challenging such an action, you may choose to allege that the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in Appendix A. Attach the agency's proposal letter, decision letter, and SF-50, if available.

See Continuation Sheet for Response.

Appeal Number: **202302197**
Submission Date: **5/16/2023 4:49:03 PM**
Confirmation Number: **219042**

 # MERIT SYSTEMS PROTECTION BOARD

## Appeal of Agency Personnel Action or Decision (Non-retirement)

*Please type or print legibly.*

6. With respect to the agency personnel action or decision you are appealing, have you, or has anyone on your behalf, filed a grievance under a negotiated grievance procedure provided by a collective bargaining agreement?

☐ Yes ☑ No

7. If your answer to question 6 is "Yes," on what date was the grievance filed (month, day, year)?

NOT APPLICABLE

8. If your answer to question 6 was "Yes," has a decision on the grievance been issued?

NOT APPLICABLE

9. Did you file a whistleblowing complaint with the Office of Special Counsel (OSC)?

☐ Yes ☑ No

10. Have you received written notice that the Office of Special Counsel made a decision or terminated its investigation?

NOT APPLICABLE

11. Did you file a complaint on this matter with the Department of Labor (DOL)?

☐ Yes ☑ No

12. Has the Department of Labor notified you that your USERRA or VEOA complaint could not be resolved?

NOT APPLICABLE

Appeal Number: **202302197**
Submission Date: **5/16/2023 4:49:03 PM**
Confirmation Number: **219042**



# Merit Systems Protection Board Form 185-2
### Appeal of Agency Personnel Action or Decision (Non-retirement)

## Continuation Sheet

5. Explain briefly why you think the agency was wrong in taking this action. In challenging such an action, you may choose to allege that the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in Appendix A. Attach the agency's proposal letter, decision letter, and SF-50, if available.

The Agency was wrong in taking this adverse action. The facts and circumstances as gathered by Agency in its investigation are false, inaccurate, obtained unlawfully. The Agency engaged in harmful procedural error, committed Prohibited Personnel Practices, violated the employee's due process and other rights under the law including unlawful discrimination and retaliation. The Agency action taken is not in accordance with the law.
Note: details supporting the aforementioned will be set forth in supplemental filings in accordance with No. 16 directive (for brevity and later opportunities to supplement filings).

Note: SF-50 (not provided by Agency)

# e-Appeal Attachment Transmittal

**Appeal Number:**      **202302197**
**Appellant Name:**     **Danielle Dreyer**
**Agency Name:**        **Department of Justice**

Please check the box for each document included with this transmittal.

| ☒ | Name of Attachment | Attachment Processing Status | File Name/Delivery Method |
|---|---|---|---|
| ☒ | Designation of Representative Form | Upload with e-Appeal | Designation of representative-signed.pdf |
| ☒ | Agency Proposal Letter | Upload with e-Appeal | Agency Proposal Letter.pdf |
| ☒ | Agency Decision Letter | Upload with e-Appeal | Dreyer - DECISION LETTER.pdf |
| ☒ | SF-50, Notification of Personnel Action | Document not available or not applicable | N/A |

2 copies must be submitted of all documents submitted in hardcopy.
Send documents to be submitted in paper form to:
New York Field Office
26 Federal Plaza Room 3137A
New York, New York 10278
United States of America

Phone: (212) 264-9372
Fax: (212) 264-1417

## PART 4 — Designation of Representative

26. Has an individual or organization agreed to represent you in this proceeding before the Board? (You may designate a representative at any time. However, it is unlikely that the appeals process will be delayed for reasons related to obtaining or maintaining representation. Moreover, you must promptly notify the Board in writing of any change in representation.)

[X] Yes *(Complete the information below and sign)*          [ ] No

**DESIGNATION:**

"I hereby designate    Raymond Mansolillo Esq.    to serve as my representative during the course of this appeal. I understand that my representative is authorized to act on my behalf. In addition, I specifically delegate to my representative the authority to settle this appeal on my behalf. **I understand that any limitation on this settlement authority must be filed in writing with the Board.**"

Representative's address *(number and street, city, State and Zip code)*

Address:  One Marina Park Drive
Suite 1410

City:    Boston

State:   MA          Zip Code: 02210

Representative's telephone numbers *(include area code) and e-mail* address

Office:    6178077061

Fax:    6178077001          Other:    4016404225

e-Mail Address:    mansolillo@cox.net

### SIGN BELOW TO MAKE YOUR DESIGNATION OF REPRESENTATIVE EFFECTIVE

Appellant's Signature

Date *(MM/DD/YYYY)*    05/16/2023



**U. S. Department of Justice**
Drug Enforcement Administration
Board of Professional Conduct

---

*www.dea.gov*

Danielle L. Dreyer                                          JAN 2 5 2023
Criminal Investigator
Drug Enforcement Administration
New York Division

Dear Ms. Dreyer:

    This letter is notice of a proposed action to be taken in accordance with Title 5, Code of Federal Regulations (C.F.R.), Part 752, and the authority vested in me by Drug Enforcement Administration (DEA) directives. Based on the charges of **1) Conduct Unbecoming a DEA Special Agent, 2) Use/Possession of Drugs (Three Specifications), 3) Failure to Follow Written or Oral Instructions (Two Specifications), and 4) Lack of Candor (Two Specifications)**, I propose to remove you from your position of Criminal Investigator, GS-1811-13, and from Federal service, to promote the efficiency of the service. These charges are based on Office of Professional Responsibility (OPR) Investigative File MI-C1-2022-0035. This action, if found warranted, will be taken no earlier than thirty (30) calendar days from the date you receive this notice. The charges and reasons supporting this action are detailed below.

**Background**

    This OPR investigation was initiated on February 25, 2022, as a result of information discovered following the criminal prosecution of former Special Agent (SA) Jose Irizarry, Cartagena (Colombia) Resident Office (RO), and during the course of the OPR investigation into SA Irizarry's misconduct.[1] Former SA Irizarry resigned from DEA on February 10, 2018; was arrested on February 21, 2020; and was sentenced to one-hundred forty-five (145) months in the Bureau of Prisons on December 9, 2021. The information giving rise to former SA Irizarry's resignation from DEA and ultimate criminal conviction was first discovered by former Regional Director (RD) Richard M. Dobrich, Andean Region, who reported that he was informed on October 2, 2017, by Attaché Luis Sierra, Department of Homeland Security, Homeland Security Investigations (HSI), of suspicious activity by former SA Irizarry, which could be damaging to the United States' mission in Colombia. Former RD Dobrich also reported that in May 2017, DEA SA Bruce W. Osterhagen, Office of Training (TR), advised former DEA Assistant Regional Director (ARD) James C. Kuykendall, Cartagena RO, of suspicious behavior by former SA Irizarry during a meeting with purported Confidential Sources.

---

[1] OPR investigation PR-ZU-2018-0050 was initiated on October 5, 2017, pursuant to a memorandum, with attachments, dated October 4, 2017, from former Regional Director (RD) Richard M. Dobrich, Andean Region, to former Deputy Chief Inspector (DCI) William T. McDermott, OPR, entitled, "Referral to OPR; Special Agent Jose Irizarry Cartagena (Colombia) Resident Office."

Danielle L. Dreyer                                                                                          Page 2

On May 6, 2020, former SA Irizarry was interviewed by the Federal Bureau of Investigation (FBI). According to the FBI form FD-302, dated May 7, 2020, former SA Irizarry provided the following information during his interview. Former SA Irizarry told FBI Investigators he started using drugs, specifically Ecstasy, during the end of his time in Colombia. Former SA Irizarry said he witnessed two DEA SAs using Ecstasy; you and GS Koger. Former SA Irizzary also informed FBI Investigators you were in Colombia for work and attended a party in former SA Irizarry's condo building. Former SA Irizarry said you and GS Koger approached him during the party and asked former SA Irizarry if he had anything you could party with. Former SA Irizarry informed FBI Investigators that he said yes and gave you Ecstasy. Former SA Irizarry also told FBI Investigators the group went on his boat the next day and he witnessed you and GS Koger taking the drugs then as well. On July 14, 2020, former SA Irizarry was interviewed by HSI. The HSI Report of Investigation (ROI), dated September 3, 2020, indicated that, during the interview, former SA Irizarry voluntarily provided the following statements in sum and not verbatim. Former SA Irizarry stated he provided you Ecstasy in Cartagena during a party at the pool on the rooftop of his apartment. Former SA Irizarry also stated he observed you squirt breast milk in front of others at the party, and that he was later told by the others some form of group sex had taken place.

During the course of this investigation, information was discovered indicating that, while on Temporary Duty (TDY) in Cartagena in September 2017, you were in possession of and consumed illegal drugs and engaged in multiple acts of lewd, vulgar, and unprofessional conduct during a rooftop party, hosted by former SA Irizzary in Columbia, which easily could have been accessed or viewed by the general public. You were also in possession of drugs the day following the party while aboard former SA Irizarry's boat. In addition, you failed to report the illegal misconduct and were less than candid during your sworn OPR interview regarding whether you requested and consumed illegal drugs.

**Charge 1:  Conduct Unbecoming a DEA Special Agent**

On or about September 29, 2017, you conducted yourself in an unprofessional manner when you engaged in multiple acts of inappropriate and lewd behavior at a rooftop party held in a public location in Cartagena, Colombia.

Specifically, on or about September 29, 2017, you attended a party on the rooftop of an apartment building in Cartagena, Columbia. Sworn witness testimony indicated the rooftop area included a grill, a hot tub, and a pool, all of which were communal, serving as a lounging area for residents of the building. During the party, you engaged in multiple acts of inappropriate, unprofessional conduct while in and around the rooftop hot tub. In addition to yourself, former Group Supervisor (GS) Aaron Koger, New York Division, former Assistant United States Attorney (AUSA) Marissa T. Darden, Northern District of Ohio, SA Jeffrey M. Hathaway, Boston Division, SA Paul D. Stroney, Detroit Division, Intelligence Research Specialist (IRS) Eric D. Duerr, Cartagena RO, and SA Kristopher H. White, Cartagena RO (transferred), were also in and around the hot tub at the time of the below described events. Sworn witness testimony indicated that, while in the hot tub, you removed your top and exposed your breasts, sat on GS Koger's lap, straddled GS Koger and made loud comments about qualifying for an outstanding evaluation, sat between GS Koger and SA Hathaway, both of whom were naked, and performed sexual acts on them, straddled SA Stroney, sat on SA Stroney's lap and squirted milk from your breasts, kissed AUSA Darden, who was also topless in the hot tub, and fondled AUSA Darden's breasts. In addition, while at the

Danielle L. Dreyer                                                                    Page 3

party, you took possession of and consumed Ecstasy. The rooftop area was accessible to residents of the building and their guests; therefore, anyone with access to the building could have accessed the rooftop at any moment during the party and observed your behavior.

During SA White's sworn OPR interview on January 24, 2022, OPR Inspectors questioned whether SA White recalled anything interesting happening at the party. SA White stated *"Some people got naked... Danny got naked. I believe Hathaway got naked. The other guy – did you say Coger* [sic]*?"* OPR Inspectors clarified and stated, *"But you recall Danny being fully naked, Hathaway being fully naked, and Coger* [sic] *being fully naked?"* SA White stated, *"Correct."* OPR Inspectors questioned SA White as to whether he believed the events at the apartment building constituted unprofessional conduct. SA White stated, *"Yes... the drinking and the girls without clothes on and guys with no clothes on running around in more or less a public format."* During SA White's second sworn OPR interview on April 28, 2022, OPR Inspectors questioned whether everyone was wearing appropriate attire in the hot tub. SA White stated, *"... I can't recall all but the other three were naked."* OPR Inspectors clarified and stated, *"And the other three we're talking about Special Agent Dreyer, Special Agent Koger and Special Agent Hathaway?"* SA White stated, *"Correct."*

In addition, sworn testimony from multiple witnesses indicated you squirted milk from your breasts while in the hot tub. During SA Stroney's sworn OPR interview on April 28, 2022, OPR Inspectors questioned SA Stroney whether he recalled you doing anything out of the ordinary or shocking in the hot tub. SA Stroney stated, *"Danielle made a comment to me about, uh, she said that she's had children. And even after having children she was still, um, she was still able to lactate. And at one point, she came over I don't remember if she -- she was straddling me or she's, like, standing in front of me, but she was like squirting milk at my -- at my face...It was -- it was surreal...yes, she made that comment and she was at least acting like she was able to lactate."* OPR Inspectors questioned SA Stroney whether you were manipulating your breast in a way that would indicate you were trying to squirt breast milk at him. SA Stroney stated, *"Yes. That's a fair statement."* OPR Inspectors questioned whether SA Stroney felt anything hit his face when it happened. SA Stroney stated, *"Yes. I felt something hit my cheeks, but from what I remember, I had my head -- my head, like, turned to the side."* SA Stroney further stated, *"She* [you] *said something about like, yes, I'll prove -- I'll prove I can still squirt milk."*

SA White also testified that he witnessed you squirting breast milk from your breasts. During SA White's sworn OPR interview on January 24, 2022, when questioned by OPR Inspectors whether anything interesting happened at the party, SA White stated, *"I remember Dryer* [sic] *trying to squirt breast milk."* During SA White's second sworn OPR interview on April 28, 2022, OPR Inspectors clarified and again questioned whether he recalled you squirting breast milk. SA White stated, *"I've been thinking and I do recall her skirting* [sic] *breast milk."*

AUSA Darden was interviewed by the Department of Justice (DOJ) Office of the Inspector General (OIG) on May 5, 2022, and stated, *"The point at which I thought it was time for me to go. I remember this. Was when she* [you] *stood up. I think it was from the hot tub. And she squirted breast milk out of her breasts."* OIG SAs questioned AUSA Darden whether she recalled who was right there with you, who was involved in that scene. AUSA Darden stated, *"Special Agent Stroney, the analyst, the three - you know I remember the three -. These three came as a package...The New York folks...They were together. So I don't remember if she was standing right next to them or if they*

Danielle L. Dreyer                                                                                      Page 4

*were nearby."* When questioned by OIG SAs whether it was in the hot tub, AUSA Darden stated, *"I believe she was in the hot tub."* OIG SAs questioned AUSA Darden whether she decided it was time to go when that happened. AUSA Darden stated, *"I remember thinking like this is out of hand."*

During your sworn OPR interview on January 25, 2022, OPR Inspectors questioned whether you squirted breast milk at the party. You stated, *"Um, I truly do not recall that. Um, but I was probably still breast feeding at that point. It's possible. I do not recall ---."* OPR Inspectors noted that you laughed when the question was asked as if it had been brought up to you. You stated, *"I knew that I had an -- I can't believe this is -- I had an ample supply of breast milk. And I do not recall squirting breast milk at her."* OPR Inspectors questioned whether you considered your conduct unprofessional. You stated, *"Well, I'm horrified at breast milk story. Um, it's embarrassing certainly."* OPR Inspectors questioned whether you now recalled it. You stated, *"I don't...but I believe it...because I could shoot breast milk out of my nipple. So, I knew that I could."* You added, *"If you're telling me and if people are saying I squirt breast milk out of my nipple that night then I believe it...I knew that I could squirt breast milk out of my nipples, so, yes. I had done it in the past perhaps in the privacy of my own home, perhaps to show my husband. Hey, look at this amazing breast milk supply. Um, I did not realize that I was doing it at parties."*

In addition, sworn testimony from multiple witnesses indicated you appeared to be engaging in sexual activity with GS Koger and SA Hathaway while in the hot tub. During his sworn OPR interview on April 28, 2022, SA Stroney stated, *"when we were in the hot tub -- we were all sitting in the hot tub. So the reason I can't say for sure is because I mean there were -- there were bubbles going. I couldn't see what was going on below the surface, but the way some people were moving, it did look like sexual activity. And -specifically, there was -- at one point, um, Danielle was sitting between -- she was sitting between her GS and Jeff. And she had her hands down, like, at her sides. I don't know. She could have been -- she could have been giving them hand jobs."* OPR Inspectors questioned SA Stroney as to whether there was further information they should be made aware of. SA Stroney stated, *"I remember at one point when we were in the hot tub, Danielle was -- was straddling her GS and she was, like, grinding on him and she was saying things like, oh, do I get an outstanding now?"* During his sworn OPR interview on April 29, 2022, SA Stroney stated, *"Um, and also I wanted to clarify. I think I said yesterday that at one point she was straddling her -- her GS's lap...she may have turned around and then facing, like, the same direction as him, too...she was moving, like, she was, like, gyrating. Like, it looked like they could have been having sex, but like I said with the water, I can't tell if they were simulating or if they were actually doing that. And it was around the same time she was making comments about like, oh, do I have that outstanding now...after that was when I saw her GS walking, like, over -- I think there was a fridge over by the grill. I think he was walking over to the fridge naked. I briefly saw him naked out of the hot tub."*

SA White also indicated your actions were indicative of engaging in sexual acts. During his sworn OPR interview on April 28, 2022, OPR Inspectors questioned SA White whether you, GS Koger, and SA Hathaway engaged in sexual activity while in the hot tub. SA White stated, *"...it was those three who were -- who were, um, naked. I mean, whatever -- I didn't physically see any touching of genitals or anything -- anything being inserted, excuse me, anywhere...I didn't see -- I couldn't see in the hot tub, I don't know what was going on below the water."* OPR Inspectors

Danielle L. Dreyer                                                                Page 5

questioned what he saw to make him believe you were engaged in sexual activity. SA White stated, *"Um, sitting on -- Dreyer sitting on, um, the laps, you know, or sitting, you know, very closely to them."* OPR Inspectors questioned SA White whether he believed you were giving them hand jobs. SA White stated, *"Ah, the way she was sitting I would assume so, yes, but, again, I didn't – I didn't visually see it, no. But the way she was sitting I would assume so, yes…She would, you know, a few minutes sit on, you know, like the lap or sit between them or, you know, they were constantly moving around. It wasn't just like sit and stall. It was, you know, there's -- she was -- people were always moving around in the hot tub."* OPR Inspectors questioned SA White, based on what he saw, why he agreed with the OPR Inspector that you may have been giving SA Hathaway and GS Koger hand jobs. SA White stated, *"I mean sitting in between two guys, I mean, and her hands are below water, I, you know, for a short period of time I, I mean your guess is as good as mine, but it's, you know what I mean? I don't know. Like I said I never physically saw it but I -- I could assume like everybody else could assume"*

      AUSA Darden also indicated you engaged in sexual contact with GS Koger and SA Hathaway while in the hot tub. During her sworn OIG interview on May 5, 2022, OIG SAs questioned AUSA Darden as to whether there was intimate contact between individuals while in the hot tub. AUSA Darden stated, *"The female agent* [you] *and the tall gentleman who I mentioned from DEA from the New York office.* [GS Koger] *I recall them touching…And the other gentleman - the one you showed me with the spiky hair that I said was a bit overweight in the picture* [SA Hathaway]." OIG SAs requested AUSA Darden to describe the touching. AUSA Darden stated, *"In the hot tub, I remember seeing them fondling her is probably the best way to describe it maybe. I don't remember if there were -. I remember her kissing the other gentleman - the other man. Not this guy. But the other guy from New York.* [GS Koger] *I remember seeing them kiss for sure. I don't think they had any clothes on."* OIG SAs clarified and questioned whether any of the three of you had clothes on. AUSA Darden stated, *No. . .sort of intimate in the hot tub, it's definitely possible that they were - like hands underneath the bubbles. I can't say what was going on. I don't know….But there was certainly some - There was a level of intimacy amongst the three of them -- that was very palpable."* AUSA Darden added, *"But it was very clear that they had some kind of intimate relationship."* OIG SAs questioned AUSA Darden as to whether she ever saw you and GS Koger kiss. AUSA Darden stated, *"I believe so… That night for sure…they seemed like they had a very clear, intimate relationship amongst the three of them but the two of them specifically."* OIG SAs questioned whether it was possible GS Koger and SA Hathaway were "having a hand job." AUSA Darden stated, *"Yeah. I think that's possible. I didn't see that. I definitely remember seeing her hands underneath the water."*

      In addition, during your sworn OPR interview, you admitted you engaged in intimate contact with AUSA Darden while in the hot tub. You informed OPR Inspectors you and AUSA Darden were topless in the hot tub. When questioned by OPR Inspectors whether you and AUSA Darden engaged in touching and kissing each other, you stated, *"We were."* Sworn witness testimony confirmed both you and AUSA Darden removed your tops, exposed your breasts and indicated you may have engaged in sexual conduct while in the hot tub. During SA Stroney's sworn OPR interview on April 28, 2022, OPR Inspectors questioned SA Stroney whether he observed any sexual conduct between you and AUSA Darden. SA Stroney stated, *"so Marisa and Danielle were -- they were close to each other. They seemed attracted to each other…they were close -- they may have kissed…And at one point, they -- I don't know the -- I don't know the proper term for it. They -- they might have been fingering each other under the hot tub, under the water. Like I said, I can't tell*

Danielle L. Dreyer                                                                                    Page 6

*for sure because of the -- all the bubbles, the surface agitation. And at the time, I remember thinking like, are they actually like -- are they putting on a show for the guys, or are they actually, like, genuinely doing this?"* During his sworn OPR interview on April 29, 2022, SA Stroney stated, *"when Danielle and Marisa were...were in the hot tub...they were being very intimate...I could clearly see that they were kissing...Danielle was, like, fondling Marisa's breasts. I think Marisa was fondling Danielle's breasts...They were touching each other's breasts. And Danielle made comments about, like, she loved Marisa's breasts... when they were -- they may have been -- they have been, like, necking a little bit, too. And I mean they -- they were moving, I would say, rhythmically. They were at least simulating, um, digital penetration...they were groping each other at -- at least on the breasts, possibly on their genitalia under the water. And I think they were pretty much, like, taking turns kind of going back and forth."*

SA White also testified he witnessed the conduct between you and AUSA Darden. During his sworn OPR interview on January 24, 2022, OPR Inspectors questioned SA White whether anyone engaged in any sexual acts. SA White stated, *"Just the two girls touching each other. That's the only thing I saw. Touching each other's breasts or whatever. One was touching the other one's."* During his sworn OPR interview on April 28, 2022, OPR Inspectors questioned SA White whether he recalled who engaged in any form of sexual activity while in the hot tub, or outside the hot tub, in front of others. SA White stated, *"Ah, it was those three [you, GS Koger, and SA Hathaway] who were -- who were, um, naked. I mean, whatever -- I didn't physically see any touching of genitals or anything -- anything being inserted, excuse me, anywhere. Um, so, and then, um, Dreyer and Darden they kissed each other and touched -- I think touched each other's breasts and that was it."*

The <u>DEA Personnel Manual</u>, Section 2735.20 (I) (1), Conduct Prejudicial to the Government, states, *"I. Unprofessional Conduct. 1. Every DEA employee is responsible for behaving in a professional manner appropriate to the setting, and in a civil and courteous manner toward other DEA employees and the general public. Employees will be mindful that their conduct and demeanor reflects directly upon DEA and will ensure that their actions do not reflect unfavorably upon DEA. Employees are prohibited from acting in a manner which brings disgrace or disfavor upon DEA or in a manner that will cause the general public to question, ridicule or attack the efforts of this agency or its personnel."*

The <u>DEA Personnel Manual</u>, Section 2735.12 (C) (1) (3), Responsibilities, states, *"C. All DEA Employees. DEA personnel, as members of the law enforcement community, occupy positions of trust. It is the responsibility of all DEA employees to: 1. Refrain from engaging in any . . . notoriously disgraceful conduct or other conduct prejudicial to DEA, to DOJ, or to the United States Government. This includes any conduct that indicates that an employee failed to exercise good judgment either on or off duty. DEA personnel shall always conduct themselves in a professional manner and observe the DEA Standards of Conduct, as well as applicable orders, policies, regulations, and laws of DEA, DOJ, and the federal government... 3. All DEA employees shall avoid any actions that create the appearance that they are violating the law or the ethical standards set forth in the DEA Standards of Conduct, or in any applicable orders, policies, regulations, and laws of DEA, DOJ, and the federal government."*

As such, your actions as described above constitute **Conduct Unbecoming a DEA Special Agent**, and you are so charged.

Danielle L. Dreyer

**Charge 2: Use/Possession of Drugs**

_Specification 1:_ On or about September 29, 2017, you willingly accepted and were in possession of a Schedule I controlled substance.

Specifically, during your sworn OPR interview, you admitted that, during the above-referenced party on or about September 29, 2017, you willingly accepted and were in possession of Ecstasy, a Schedule I controlled substance. OPR Inspectors posed questions regarding the party and whether the event that night got out of control. When questioned by OPR Inspectors whether you asked former SA Irizarry to get you Ecstasy, you stated, *"I did not."* You added, *"Jose's wife passed me a pill. I don't know what it was to this day. It's possible it was ecstasy. It was a little blue pill. It's possible it was Viagra, I don't know. Um, I wanted Jose to think that I took it.... The pill that she gave me...I thought it may have been Viagra um or ecstasy."* OPR Inspectors questioned how it came to be that former SA Irizarry's wife passed you a pill. You stated, *"We were sitting around a table...She was next to him. Um, and at some point she took out a little bag that had several small blue pills in it and passed one over and I accepted it."* OPR Inspectors questioned what you believed the pill to be. You stated, *"Um, at the time I thought maybe Viagra or GHB."* OPR Inspectors questioned whether you told someone you thought you took Ecstasy. You stated, *"I wanted Jose to think that I had taken it. Whatever the pill was that she gave me."* OPR Inspectors questioned what you believed it was. You stated, *"I assumed in hindsight that it was ecstasy. It's -- at the time I thought maybe GHB or Viagra, um, and after I now assume it was ecstasy."* OPR Inspectors questioned what you did with the pill. You stated, *"It went into my bra...We were sitting around a table."* When questioned by OPR Inspectors why former SA Irizarry's wife would have thought you wanted the pill in the first place, you stated, *"I – I don't know. Maybe just the whole party – party atmosphere. I don't know."* OPR Inspectors questioned whether you stayed sitting at the table with former SA Irizarry and his wife after she gave you the pill. You stated, *"Um, for a while."*

As previously mentioned, during former SA Irizarry's FBI interview on May 5, 2020, former SA Irizarry told FBI Investigators that he witnessed two DEA SAs using Ecstasy; you and GS Koger. Former SA Irizarry told FBI Investigators you and GS Koger approached him during the party and asked him if he had anything you could party with, to which he said yes and gave you Ecstasy.

_Specification 2:_ On or about September 30, 2017, you willingly accepted and were in possession of a Schedule I controlled substance.

Specifically, during your sworn OPR interview on January 25, 2022, you admitted that, while aboard former SA Irizarry's boat on or about September 30, 2017, you willingly accepted and were in possession of Ecstasy, a Schedule I controlled substance. OPR Inspectors questioned you regarding the boat trip; specifically, whether you saw any more pills on the trip and who had the pills. You stated, *"Jose had pills on that trip as well."* OPR Inspectors questioned whether they were the same kind of pills from the previous day. You stated, *"Yes."* When questioned by OPR Inspectors whether former SA Irizarry gave you one of the pills, you stated, *"He gave me one that, again, I did not take and it ended up in the boat cushions...he handed it to me."* OPR Inspectors questioned when you were given the pill during the boat trip. You stated, *"I remember going down*

Danielle L. Dreyer                                                                                    Page 8

*to the bathroom and he was coming up from down below and just kind of put it in my hand...I must have held onto it until I got back up top and then just wedged in the cushions."*

In addition, as previously mentioned, during former SA Irizarry's FBI interview on May 5, 2020, former SA Irizarry told FBI Investigators the group went on his boat the next day and he witnessed you and GS Koger taking the drugs then as well.

<u>Specification 3</u>: On or about September 29, 2017, you used and were under the influence of a Schedule I controlled substance.

Specifically, during the party on or about September 29, 2017, you used and were under the influence of a Schedule I controlled substance, Ecstasy. As indicated above in Specification 1, you admitted you accepted and were in possession of pills, which you assumed to be Ecstasy, the night of the party. Although you deny consuming the pills, your improper, outlandish behavior during the party, as well as not being able to recall engaging in such distasteful behavior, is indicative of being under the influence of a controlled substance.

During his sworn OPR interview on April 29, 2022, SA Stroney informed OPR Inspectors he perceived you were under the influence of Ecstasy based on the promiscuous behavior being displayed the evening of the party. SA Stroney stated, *"It was my perception based on behavior because, um, just because of how promiscuous Danielle was asking was acting. And actually, yes, I had seen her before that -- that party. She was -- she seemed quiet and -- which was natural because I assumed she was around a bunch of people she didn't know. She wasn't outwardly social or anything. And then she was very promiscuous in the hot tub area or in the hot tub. And then the next night, she was very quiet and reserved again. And based on that change in demeanor and how, um -- you know, too, like, it was very -- she was being very sensual with -- with Marisa. Like, it was -- it -- it was -- I don't know how you like, intimate. Like, um, it was -- it was the way that people describe when someone -- when someone takes ecstasy, they -- they get very, like, touchy-feely, they want to hug people, they want to be close to people. And that was, like, the biggest deduction I could make was that if she was on any sort of drugs, I would assume it was ecstasy because she was acting like that. She was acting consistent with what I would expect of someone who was -- who was on ecstasy. Um, I haven't personally done very many cases involving ecstasy, so I don't know if I've ever seen somebody but just based on my training and -- and -- well, based on my training because I don't really have much experience with it. Um, that's what I would -- that's what drug came to mind that if she was on drugs"* SA Stroney stated that made him reflect on comments you and AUSA Darden made to him the night of the party. These comments were divulged during SA Stroney's sworn OPR interview on April 28, 2022. OPR Inspectors questioned SA Stroney regarding the rooftop party and whether he saw or heard about drugs being consumed at the party. SA Stroney stated, *"she [you] said something like, you're -- you're good -- you're good, you're not a stoner like me, or something like that."* OPR Inspectors then questioned SA Stroney whether AUSA Darden mentioned anything about drug use or -- or drugs being provided at the party. SA Stroney stated, *"She just made the comment to me about Dani's not very fun without drugs."* As stated above, SA Stroney informed OPR Inspectors he reflected on these comments; specifically, your statement that he was not a stoner like you and, *"when Marisa made the comment to me about Dani's not very much fun without drugs, I – I interpreted that as if if Marisa was referring to her being fun as -- as being so sexually promiscuous, then I would deduce that ecstasy was the most likely drug that would make her that way."*

Danielle L. Dreyer                                                                      Page 9

It should be noted that not only were you in possession of and under the influence of a Schedule I controlled substance, Ecstasy, on September 29, 2017, sworn witness testimony indicates you requested it. As stated above, during his FBI interview on May 5, 2020, former SA Irizarry told FBI Investigators that he only witnessed two DEA SAs using Ecstasy; you and GS Koger, and that you and GS Koger approached him during the party and asked him if he had anything you could party with, to which he said yes and gave you Ecstasy. It is the opinion of the Board you were under the influence of illegal drugs during the rooftop party on or about September 29, 2017.

The <u>DEA Personnel Manual</u>, Section 2735.20 (H) (4-7) Conduct Prejudicial to the Government, states, *"H. Use of Intoxicating Beverages or Drugs. 4. Off-duty DEA personnel subject to recall to duty shall not permit themselves to be rendered unavailable for duty through the consumption of alcohol and/or drugs. 5. DEA personnel shall not use a controlled substance except such controlled substances as may be prescribed to the employee by a duly licensed medical professional for treatment of illness or condition or as contained in an over-the-counter medication. 6. Positions in DEA are designated critical-sensitive, national security positions. As such, individuals with drug and/or alcohol abuse problems, may be precluded from employment with DEA, based on their inability to meet the criteria for obtaining the requisite security clearance (See DOJ Order 2610.2B, and Public Law 91-616 and 92-255). DOJ Order 1200.1, Chapter 7-1 allows employees with alcohol or drug problems to seek assistance under the Employee Assistance Program (EAP). A manager or supervisor may suggest that an employee seek EAP services when the employee's performance, conduct, or attendance has begun to deteriorate, or when the manager or supervisor learns information that suggests that the EAP might be of assistance to the employee. A manager or supervisor may also formally refer an employee to the EAP. A formal EAP referral is in writing, is usually verbally communicated to the employee, and states the performance, conduct, or attendance reasons why the referral is necessary. It is mandatory for a supervisor to formally refer an employee to the EAP when notified of a positive drug screen. As a condition of employment with DEA, employees must maintain their eligibility to access National Security Information (NSI). If an employee can no longer maintain their eligibility to NSI and his/her security clearance is revoked, he/she can no longer meet the conditions for employment and will be removed. 7. The phrase "under the influence" includes, but is not limited to, all of the publicly known and commonly accepted conditions and degrees of being under the influence (such as unsteady gait, slurred speech, fixed stare, loss of muscular control, strong odor of alcohol), but also includes any employee who has consumed alcoholic beverages or drugs to any extent - whether they are legally intoxicated under applicable state law or not, except as may be duly and specifically authorized for an undercover operation. There is no requirement that an employee's degree of impairment be determined with scientific accuracy by appropriate testing or that, if such testing is conducted, that the blood alcohol of the employee be at or above a certain level."*

The <u>DEA Personnel Manual</u>, Section 2735.20 (I) (1), Conduct Prejudicial to the Government, states, *"I. Unprofessional Conduct. 1. ...Employees are prohibited from acting in a manner which brings disgrace or disfavor upon DEA or in a manner that will cause the general public to question, ridicule or attack the efforts of this agency or its personnel."*

The <u>DEA Personnel Manual</u>, Section 2735.12, Responsibilities (C) (1) (2) (3), states, *"C. All DEA Employees. DEA personnel, as members of the law enforcement community, occupy positions of trust. It is the responsibility of all DEA employees to: 1. Refrain from engaging in any criminal, infamous, dishonest, or notoriously disgraceful conduct or other conduct prejudicial to*

Danielle L. Dreyer                                                                            Page 10

*DEA, to DOJ, or to the United States Government. This includes any conduct that indicates that an employee failed to exercise good judgment either on or off duty. DEA personnel shall always conduct themselves in a professional manner and observe the DEA Standards of Conduct, as well as applicable orders, policies, regulations, and laws of DEA, DOJ, and the federal government. 2. Refrain from conduct or omissions in their off-duty hours which will impact, influence, impede, or adversely affect their DEA responsibilities. 3. All DEA employees shall avoid any actions that create the appearance that they are violating the law or the ethical standards set forth in the DEA Standards of Conduct, or in any applicable orders, policies, regulations, and laws of DEA, DOJ, and the federal government."*

As such, your actions as described above constitute **Use/Possession of Drugs**, and you are so charged.

**Charge 3: Failure to Follow Written or Oral Instructions**

<u>*Specification 1:*</u>  You failed to report the use/possession of a Schedule I controlled substance on or about September 29 and September 30, 2017, resulting in your failure to follow written instructions.

Specifically, as outlined above in Charge 2, during a party you attended on or about September 29, 2017, you were in possession of and consumed Ecstasy. The following day, on or about September 30, 2017, you were again in possession of Ecstasy while aboard former SA Irizarry's boat. You failed to report both instances of drug use/possession. During your sworn OPR interview, OPR Inspectors questioned you regarding your conduct and, in an attempt to clarify, questioned whether it was just two incidents during the Cartagena trip where you received pills. You stated, *"Yes."* OPR Inspectors followed up and questioned whether you reported either one of the instances to your GS. You stated, *"I don't think I did, no...Um, I was nervous that he was -- he was already in this friend group. He knew Jeff. He knew Jose. I didn't want to be the one that rocked the ship."*

<u>*Specification 2*</u>:  You failed to report that a fellow SA was in possession of a Schedule I controlled substance on or about September 29 and September 30, 2017, resulting in your failure to follow written instructions.

Specifically, by your own admission, you were aware former SA Irizarry was in possession of Ecstasy during the party on or about September 29, 2017, and aboard his boat on or about September 30, 2017. You failed to report both instances. During your sworn OPR interview, OPR Inspectors questioned regarding the boat trip; specifically, whether you saw any more pills on the trip and who had the pills. You stated, *"Jose had pills on that trip as well."* OPR Inspectors questioned whether they were the same kind of pills from the previous day. You stated, *"Yes,"* OPR Inspectors questioned whether you should have reported to OPR that another SA had his wife pass you a controlled substance. You stated, *"In hindsight, yes...at the time I didn't know what it was...in hindsight I wish I could change that...I guess I was just trying to fit in...say what he wanted to hear."* OPR Inspectors questioned whether you believed that, as a DEA SA, you had an obligation to report another SA for being in possession of a controlled substance or illegal drugs. You stated, *"Yeah. Um, yeah."* When questioned by OPR Inspectors whether there was a reason you did not report it, you stated, *"Yeah, I was intimidated...I didn't want to be the one making accusations."*

The <u>DEA Personnel Manual</u>, Section 2735.21 (A) (2) (6), Reporting Requirements to and Cooperation with the Office of Professional Responsibility, states, *"A. Occurrences an Employee Must Report to His or Her Supervisor. In accordance with the Planning and Inspection Manual Section 8306.3 (Reporting Possible Violations and Complaints), DEA employees are required to promptly report to their supervisor or directly to OPR, any activity or situation that the employee believes to be improper, illegal, or otherwise in violation of any of the DEA Standards of Conduct. Upon receiving the notification from the DEA employee, or other source regarding the employee, the supervisor is responsible for reporting the occurrence to OPR as set forth in the Planning and Inspection Manual Section 8307. If applicable, the notification to OPR should clearly indicate if the arrest or allegation was self-reported by the employee. OPR will inform the Office of Security Programs (IS) where allegations or violations have potential to impact the DEA employee's security clearance. 2. DEA employees are required to immediately self-report through their chain of command to the SAC, RD, or HOH any arrests and allegations pertaining to on/off duty misconduct of the employee. If the initial notification is made orally, the employee must provide written notification to their supervisor as soon as possible. Written notification may be in the form of an email. At the same time, it is also the employees' responsibility to self-report arrests and allegations pertaining to on/off duty misconduct to the Deputy Chief Inspector, Office of Security Programs (DCI-IS) via e-mail at: securityreferralsref@usdoj.gov. This written notification to the DCI-IS of the arrest or misconduct allegation is provided for security clearance adjudication purposes only and should only contain the specific arrest information or allegation, not the details surrounding these issues. 6. Any other illegal activity or other misconduct must be reported and is not limited to the above instances.*

The <u>DEA Personnel Manual</u>, Section 2735.21 (B) (1) (a) (k), Reporting Requirements to and Cooperation with the Office of Professional Responsibility, states, *"B. Reporting Situations Which Reflect on the Integrity of an Employee or on DEA. Allegations or complaints regarding infractions of DEA's Standards of Conduct must be reported to the proper DEA authorities. 1. DEA employees who have information which indicates or suggests that another DEA employee is engaged in improper or illegal activities in violation of DEA's Standards of Conduct are required to immediately report such information to their supervisor or directly to OPR as set forth in the Planning and Inspection Manual Section 8308. The following integrity and security matters must be reported to OPR for investigation: a. Sale, purchase, possession or otherwise unauthorized disposition of any narcotic or dangerous drug by any DEA employee. k. Use of narcotics or dangerous drugs designated by the Controlled Substances Act except as prescribed by a physician in the treatment of a diagnosed medical condition."*

The <u>DEA Personnel Manual</u>, Section 2735.12, Responsibilities (C) (1) (2) (3), states, *"C. All DEA Employees. DEA personnel, as members of the law enforcement community, occupy positions of trust. It is the responsibility of all DEA employees to: 1. Refrain from engaging in any criminal, infamous, dishonest, or notoriously disgraceful conduct or other conduct prejudicial to DEA, to DOJ, or to the United States Government. This includes any conduct that indicates that a: employee failed to exercise good judgment either on or off duty. DEA personnel shall always conduct themselves in a professional manner and observe the DEA Standards of Conduct, as well as applicable orders, policies, regulations, and laws of DEA, DOJ, and the federal government. 2. Refrain from conduct or omissions in their off-duty hours which will impact, influence, impede, or adversely affect their DEA responsibilities. 3. All DEA employees shall avoid any actions that create the appearance that they are violating the law or the ethical standards set forth in the DEA*

Danielle L. Dreyer                                                                 Page 12

*Standards of Conduct, or in any applicable orders, policies, regulations, and laws of DEA, DOJ, and the federal government."*

As such, your actions as described above constitute **Failure to Follow Written and/or Oral Instructions**, and you are so charged.

**Charge 4: Lack of Candor**

*Specification 1:* During your sworn OPR interview on January 25, 2022, you were less than candid in your responses to OPR Inspectors regarding whether you requested drugs prior to or during the events in September 2017.

Specifically, on multiple occasions throughout your sworn OPR interview, you were less than candid in your responses to OPR Inspectors when you denied you requested drugs prior to or during the rooftop party, or boat ride, in Cartagena, Colombia, in September 2017, resulting in a lack of candor. Sworn witness testimony contradicts your statements, suggesting you not only requested the drugs beforehand, but you also were bragging about it in the hot tub.

During your sworn OPR interview, OPR Inspectors questioned whether you recalled sending any messages or making any phone calls to former SA Irizarry, whether he was there before you, or whether he left at any point or any time before the party. You stated, *"Not that I remember."* OPR Inspectors questioned whether you requested anything from former SA Irizarry for the party. You stated, *"No."* OPR Inspectors questioned whether you sent former SA Irizarry any texts during the TDY. You stated, *"Um, probably."* OPR Inspectors questioned whether you asked former SA Irizarry to get you Ecstasy. You stated, *"I did not."* OPR Inspectors questioned whether it was something you and former SA Irizarry discussed earlier in the evening. You stated, *"No."* OPR Inspectors questioned whether you asked for it or requested it. You stated, *"No."* OPR Inspectors clarified and stated, *"But his wife just provided it to you?"* You stated, *"Yes."* OPR Inspectors questioned whether you, SA Hathaway, and GS Koger discussed the drugs. You stated, *"Not that I recall. I don't think so."* OPR Inspectors questioned whether you were sure both you and GS Koger did not ask former SA Irizarry if he could get Ecstasy. You stated, *"We didn't ask Jose to get us ecstasy."* When questioned by OPR Inspectors why someone would say you announced you had asked him to get it, you stated, *"I wouldn't have asked him to get ecstasy. I've never done ecstasy in my life. I wouldn't have asked him to get ecstasy."* OPR Inspectors informed you that former SA Irizarry and a second individual told them you asked for it. You stated, *"I didn't ask for it...I didn't ask for it."*

Although you vehemently denied asking former SA Irizarry for drugs, requesting drugs, or discussing drugs, sworn witness testimony contradicts your statements and suggests otherwise. During former SA Irizarry's FBI interview on May 5, 2020, former SA Irizarry told FBI Investigators that you and GS Koger approached him during the party and asked him if he had anything you could party with, to which he responded yes, and gave you Ecstasy.

In addition, during SA White's sworn OPR interview on January 24, 2022, OPR Inspectors questioned SA White whether he had any knowledge of anyone at the party taking Ecstasy. SA White stated, *"I heard that somebody was requesting it. Danny was requesting it or something but I thought she was just goofing around. I didn't pay any attention to it."* OPR Inspectors questioned

Danielle L. Dreyer

who SA White heard that from. SA White stated, *"She just made -- she was blurting it out. I figured it was like a drunk stupid."* OPR Inspectors questioned SA White what you were blurting out. SA White stated, *"That she contacted – she contacted Jose to get Ecstasy or someone to see if Jose could get Ecstasy or something like that."* SA White added, *"I heard her say she asked Jose if he had any Ecstasy pills or whatever. That's the only thing I heard. I don't know if she took it. I know he did come up shortly after that conversation was made. I don't know if he brought anything. I didn't see anything."*

It is the opinion of the Board that you were less than truthful during your sworn OPR interview and your testimony is deemed not credible.

*Specification 2:*  During your sworn OPR interview on January 25, 2022, you were less than candid in your responses to OPR Inspectors regarding whether you took drugs during the above-mentioned events in September 2017.

Specifically, on multiple occasions throughout your sworn OPR interview, you were less than candid in your responses to OPR Inspectors when you denied you took drugs during the rooftop party, or boat ride, in Cartagena, Colombia, in September 2017, resulting in a lack of candor.

During your sworn OPR interview, OPR Inspectors asked a series of questions regarding drug use. OPR Inspectors questioned whether you took Ecstasy the night of the party. You stated, *"I did not."* When questioned by OPR Inspectors whether you told anyone you took Ecstasy, you stated, *"It's possible."* You added, *"I wanted Jose to think that I took it...The pill that she* [former SA Irizzary's wife] *gave me."* You informed OPR Inspectors you did not know what the pill was. OPR Inspectors stated that you are a DEA SA, and are smart enough to know you should not put any pill in your mouth; especially if you do not know what it is. You stated, *"Which is why I did not take it. I thought it may have been Viagra um or ecstasy."* OPR Inspectors then emphasized DEA's policy on lack of candor and reminded you of the agreement you made about being compelled and false statements.

OPR Inspectors requested you describe how former SA Irizarry's wife passed you a pill during the party. You reiterated to OPR Inspectors that you were sitting at a table when former SA Irizarry's wife passed you a small blue pill. You denied consuming it. You stated, *"I accepted it. I did not consume it."* OPR Inspectors questioned how you got away with just holding on to the pill and not taking it in front of former SA Irizarry and his wife. You stated, *"I don't know."* OPR Inspectors questioned whether you faked taking it in front of them. You stated, *"No, I don't think so. Um, I think there was just so much going on at the time I was able to get away with just kind of slipping it and no one was looking."* You informed OPR Inspectors that, at the time, you thought the pill was Viagra or GHB. However, when OPR Inspectors questioned why you told someone you thought you took Ecstasy, you stated, *"I wanted Jose to think that I had taken it...Whatever the pill was that she gave me...I wanted Jose to think that I had taken it...whatever the pill was."* When questioned by OPR Inspectors why you wanted former SA Irizarry to think you took Ecstasy, you stated, *"Because his wife had given it to me."* OPR Inspectors again questioned whether you took the pill. You stated, *"No."* You informed OPR Inspectors you put the pill into your bra. OPR Inspectors questioned where the pill went when you took your bra off. You stated, *"The hot tub. An area around the hot tub."* When questioned by OPR Inspectors whether you had taken Ecstasy before, you stated, *"Never."* OPR Inspectors questioned whether you took it

Danielle L. Dreyer

that night. You stated, *"I did not."* OPR Inspectors questioned whether you took it the next day on a boat. You stated, *"I did not."* OPR Inspectors questioned why your story was different from other people that were on the boat and whether they were lying, you stated, *"I don't know what other people had said. I did not take any ecstasy on the trip, prior to that trip, since that trip."*

You informed OPR Inspectors former SA Irizarry gave you a pill on the boat but you denied taking it. You stated, *"I did not take and it ended up in the boat cushions."* OPR Inspectors clarified and questioned whether you took a pill on the boat. You stated, *"No."* OPR Inspectors questioned whether former SA Irizarry was lying when he said he saw you take it. You stated, *"He probably assumed I took it. I'm sure I told him I took it."* OPR Inspectors informed you that your pauses and omissions were indicative of you not telling the truth and/or omitting things. You stated, *"It was a long time ago. There was alcohol involved."* OPR Inspectors then questioned how you know you didn't take it. You stated, *"I wouldn't have taken a pill that I -- and at that time I thought it was probably Viagra or GHB."* OPR Inspectors questioned whether, the following day on the boat, you asked former SA Irizarry why he was giving you the pill. You stated, *"I wanted to fit in with this group of people…I don't want to call him out, um, especially, because I wasn't positive that it was ecstasy. I mean in hindsight, yeah, I think that's what it was."* When questioned by OPR Inspectors whether you believed former SA Irizarry was not being truthful in his testimony about you taking Ecstasy, you stated, *"I believe Jose is telling you what he thinks. I wanted him to think that I took it…"* OPR Inspectors requested you explain the logic behind you wanting to convince former SA Irizarry that you took the pill. You stated, *"Of course, I wanted him to think that I had taken it if he had given it to me and I didn't say anything. I just -- like I said I didn't want to be the agent that rocks the boat, um, these were all established friends."*

OPR Inspectors noted that, after accepting the pill the first night, , you went on former SA Irizarry's boat the following day and did the same thing. You stated, *"Again, it was just a -- he put it in my hand."* OPR Inspectors questioned why former SA Irizarry would think that it is okay to give you this pill. You stated, *"Probably because of the party at the apartment prior. If he thinks I took it then he probably assumed I wanted it then, too. And I -- I didn't want to tell him no. Um, I wanted to fit in --."* OPR Inspectors questioned whether you wanted to clarify anything for the record before ending the interview and stated that they did not believe your story. OPR Inspectors added that they thought you made a big mistake but the bigger mistake was coming into the interview and lying. You stated, *"I certainly made mistakes when it came to accepting those pills. I should not have, um, I did a lot of things wrong clearly. But I did not consume anything…"*

Although you fervently denied taking Ecstasy the night of the party and on the boat the following day, your outrageous and shocking behavior during the rooftop party and sworn witness testimony contradicts your statements and suggests otherwise. During former SA Irizarry's FBI interview on May 5, 2020, former SA Irizarry told FBI Investigators he only witnessed two DEA SAs using Ecstasy; you and GS Koger. Former SA Irizarry told FBI Investigators that he witnessed you and GS Koger taking the drugs the day after the rooftop party when you and a group of individuals went out on former SA Irizarry's boat.

In addition, according to SA White, AUSA Darden informed him you took the pill. During his sworn OPR interview on January 24, 2022, OPR Inspectors questioned SA White as to what was discussed in his conversations with AUSA Darden. SA White stated, *"She said that, um, Dryer [sic] took a pill."* OPR Inspectors questioned SA White whether AUSA Darden told him about you

Danielle L. Dreyer

Page 15

taking the pill the night of the party. SA White stated, *"It was that night and the next couple...She said Danny -- she said Danny took that pill."* During his sworn OPR interview on April 28, 2022, OPR Inspectors questioned SA White as to whether he was aware of any drugs that may or may not have been at the party. SA White stated, *"Someone made the comment, I believe it was -- I believe it was, ah, Darden made the comment that Dreyer got the, um, some Ecstasy pills from Jose when he popped up there real quick."*

As previously mentioned in Charge 2, during SA Stroney's sworn OPR interview on April 28, 2022, OPR Inspectors questioned SA Stroney regarding the rooftop party and whether he saw or heard about drugs being consumed at the party. SA Stroney stated, *"she* [you] *said something like, you're -- you're good -- you're good, you're not a stoner like me, or something like that."* OPR Inspectors then questioned SA Stroney whether AUSA Darden mentioned anything about drug use or -- or drugs being provided at the party. SA Stroney stated, *"She just made the comment to me about Dani's not very fun without drugs."* OPR Inspectors questioned whether there was any mention of a specific type of drug. SA Stroney stated, *"someone – someone mentioned Ecstasy. And I remember when I heard that, I thought back and I remembered -- I thought that at one point Dani may have had like a -- like a plastic sandwich bag."* SA Stroney added, *"I should have -- I should have been more suspicious of Danielle... that night, she was -- I saw the plastic bag...and then she was crazy in the hot tub...and then when -- when she made that comment to me about -- about, like, being a stoner. About her being a stoner... And then Marisa made the comment to me later about, like, oh, Dani, she's not very much fun without drugs."*

In addition, during his sworn OPR interview on April 29, 2022, SA Stroney informed OPR Inspectors he wanted to clarify some of his previous statements regarding Ecstasy. SA Stroney stated, *"It was my perception based on behavior because, um, just because of how promiscuous Danielle was asking -- was acting. And actually, yes, I had seen her before that -- that party. She was -- she seemed quiet and -- which was natural because I assumed she was around a bunch of people she didn't know. She wasn't outwardly social or anything. And then she was very promiscuous in the hot tub area or in the hot tub. And then the next night, she was very quiet and reserved again. And based on that change in demeanor and how, um -- you know, too, like, it was very -- she was being very sensual with -- with Marisa. Like, it was -- it -- it was -- I don't know how you -- like, intimate. Like, um, it was -- it was the way that people describe when someone -- when someone takes Ecstasy, they -- they get very, like, touchy-feely, they want to hug people, they want to be close to people. And that was, like, the biggest deduction I could make was that if she was on any sort of drugs, I would assume it was Ecstasy because she was acting like that. She was acting consistent with what I would expect of someone who was -- who was on Ecstasy. Um, I haven't personally done very many cases involving Ecstasy, so I don't know if I've ever seen somebody but just based on my training and -- and -- well, based on my training because I don't really have much experience with it. Um, that's what I would -- that's what drug came to mind that if she was on drugs."* SA Stroney informed OPR Inspectors that your behavior made him reflect on your comment that he was not a stoner like you. SA Stroney added, *"when Marisa made the comment to me about Dani's not very much fun without drugs, I – I interpreted that as if -- if Marisa was referring to her being fun as -- as being so sexually promiscuous, then I would deduce that Ecstasy was the most likely drug that would make her that way."*

It is the opinion of the Board that you were less than truthful during your sworn OPR interview and your testimony is deemed not credible.

Danielle L. Dreyer

The <u>DEA Personnel Manual</u>, Section 2735.20 (D) (1) (2) (3) (4) (5), Conduct Prejudicial to the Government, states, *"D. Employee Truthfulness. DEA personnel, as members of the law enforcement community, must be at all times candid and truthful in the performance of their duties. 1. DEA personnel, when directed to do so by appropriate authority or during the scope of their official duties, must testify or respond to questions under oath as required. This duty to respond fully and truthfully applies during administrative interviews and any other official agency business and is applicable whether the employee concerned is providing a statement about his/her own misconduct, the misconduct of others, observed facts, past recollections, opinions, or is providing a written or oral communication upon which a trier of fact or other similar body or forum will or may have cause on which to rely or consider. 2. DEA personnel will testify truthfully in all matters and will always be honest and forthright in any statement, communication, or testimony they author, provide, condone, or otherwise cause others to rely upon. 3. DEA personnel will recount and provide all facts, data, information, and any other form of evidence in a truthful and fully responsive manner. DEA personnel will not omit or distort facts or other information when questioned . . . It is incumbent upon the employee to ensure that any and all information he/she provides, whether orally or in writing, is accurate and complete. 4. [I]n all other matters, the employee must respond fully to questions posed by appropriate personnel. 5. DEA employees in series 1811, 1801, 132, and 1320 have a heightened duty to ensure information or testimony they provide under oath (or affirmation) in written or oral form is accurate, complete, and truthful."*

The <u>DEA Personnel Manual</u>, Section 2735.20 (E) (1) (2), Conduct Prejudicial to the Government, states, *"E. Lack of Candor. 1. DEA employees will not omit or conceal information that in the circumstances should have been disclosed in order to make a written or oral statement accurate and complete. Knowing failure to be forthright includes, but is not limited to, omission or concealment in employment and official documents or other matters under official investigation. 2. DEA employees will not permit a known falsehood to continue unreported or unchallenged, or provide non-responsive answers to properly authorized officials such as supervisory personnel, prosecutors, or agency investigators."*

As such, your actions as described above constitute **Lack of Candor**, and you are so charged.

**Penalty Discussion**

In determining the proposed penalty, I have considered the nature and seriousness of your conduct in relation to your duties and responsibilities as a DEA SA. I have also considered your ten years of government service, your performance record, and the fact you have no prior discipline with DEA. I have considered the consistency of the proposed penalty with those imposed upon other employees for the same or similar offenses and with the DEA's <u>Standard Schedule of Disciplinary Offenses and Penalties</u>.

As a DEA SA, you occupy a position of public trust in which you are held to a high standard of personal conduct, both on and off duty, in order to promote the public confidence in the integrity and dependability of DEA, and to ensure that embarrassment is not brought upon the Agency. Your conduct should be beyond reproach and should withstand public scrutiny both personally and professionally. Your actions, whether on duty or off duty, may adversely affect the public's perception of the Agency as a whole, and may otherwise negatively impact the efficiency of the

Danielle L. Dreyer                                                          Page 17

service and the mission of the Agency. Furthermore, you are expected at all times to adhere to DEA policy and the Standards of Conduct.

Your conduct during the rooftop party on September 29, 2017, and while aboard former SA Irizarry's boat on September 30, 2017, was egregious, and adversely affected the Agency's mission and the Agency's trust and confidence in your ability to hold a federal law enforcement position. Your behavior was vulgar, illegal, and showed a complete disrespect for the position you hold as a DEA SA. You engaged in lewd and indecent acts in a public location that rendered the Agency highly susceptible to negative public scrutiny at home and abroad. Indeed, Columbia, where the misconduct occurred, is a country with which the United States cooperates to combat illegal trafficking of narcotics. Moreover, engaging in this type of lewd and inappropriate conduct seriously jeopardizes workforce cohesion, morale, and decorum.

As a federal law enforcement officer, you should be aware of fellow DEA SAs whose past indiscretions involving similar acts of misconduct led to severe discipline, scarred the reputation of DEA and caused significant embarrassment to the Agency. It is especially troubling that you engaged in such behavior in an area that could have been accessed by anyone residing in the building, or their guests. Whether on or off duty, you are a representative of DEA and are expected to conduct yourself in a respectable manner at all times. You failed to do so when you were in possession of and consumed illegal drugs, were topless in the rooftop hot tub with your GS, a female AUSA, and several male co-workers, engaged in sexual acts with your GS and a fellow male SA, kissed the AUSA and fondled her naked breasts, squirted breastmilk, and made comments regarding a positive performance rating as a result of your promiscuous behavior with your GS. Your actions were appalling as a seasoned law enforcement officer and employee of the federal government.

Significantly, your possession and use of illegal drugs, specifically Ecstasy, demonstrates a serious lack of judgment and is blatantly inconsistent with the mission of the Agency. Possession and consumption of an illegal drug damages the Agency's public reputation, interferes with the Agency's mission, and breaches the ethical standards required of law enforcement officers. In your position as a DEA SA, you are entrusted with and authorized to carry a firearm. Your being under the influence of alcohol and drugs exacerbates the potential for a tragic outcome. This is yet another example of your complete and total disrespect for your position as a DEA SA and disregard for the principles the Agency stands behind. Professional as well as personal integrity and character are core expectations of public service and employment with a law enforcement agency, especially one with DEA's mission.

In addition, you failed to report your possession and consumption of drugs. You also were aware that former SA Irizarry was in possession of drugs and distributed them. You failed to report this misconduct as well. As a DEA SA, and pursuant to DEA policy, you are required to self-report any on or off duty illegal or improper conduct that may violate the Standards of Conduct. You are also required to report information that indicates a fellow DEA employee has engaged in improper or illegal conduct. It is the opinion of the Board that the justification you provided to OPR Inspectors stating you did not want to, *"rock the boat,"* lacks credibility. As numerous witnesses testified, the misconduct that occurred at the rooftop party was so, "out of hand," that it would or should have caused any reasonable DEA employee to self-report. At the time of your OPR interview, it had been over four years since the rooftop party and you had no intentions of reporting

Danielle L. Dreyer

any of the misconduct. The record clearly indicates that you did not self-report in fear of discipline being imposed and that you did not report former SA Irizarry for fear of self-implication.

In addition, your less than truthful and conflicting statements to OPR Inspectors brings into question your integrity and honesty. You were less than candid during your sworn OPR interview regarding whether you requested and consumed illegal drugs. OPR Inspectors pointed out the unlikely hood of your statements being true. Toward the end of your sworn OPR interview, OPR Inspectors stated, *"I have a hard time believing any agent or their wife would hand a pill believed to be Ecstasy, GHB or another altering substance to somebody during a party. It's just not -- that's not normal behavior at any party that I've been at in 24 years amongst agents. But we're sitting here talking about it and you're sitting across the table from me trying to convince me that you just took it and, you know, were calm enough to just put it in your bra and not take it. If I had another agent or their wife give me something to take like I'd probably be pretty shocked like right then and there I would probably address, what is it? I wouldn't just take it and put it in my pocket. . .nor would I want them to believe I took it. And you weren't a young agent trying to fit in. You had five years on the job. I don't believe you're being truthful."* The Board is in agreement with OPR's assessment of your testimony. Despite sworn witness testimony contradicting your statements, including that of former SA Irizarry, who admitted he provided you the drugs, and testimony from your fellow DEA SAs who were present during the rooftop party, you continued to deny requesting and consuming any illegal drugs either at the rooftop party or on former SA Irizarry's boat in September 2017. We find your testimony during your sworn OPR interview less than forthright and deem it not credible.

The information contained in the OPR investigative file, specifically your lack of forthrightness and lack of candor during your sworn OPR interview could cause any reasonable person to call into question your judgment, integrity, and trustworthiness. As a DEA SA, you are required to be truthful and provide all facts and information in a fully responsive manner. You are not to omit, distort, or misrepresent facts or information when being questioned during an interview. Your failure to provide accurate and complete information to OPR Inspectors are acts of misconduct that fall well below that expected of an individual employed by a law enforcement agency, demonstrates a lack of sound judgment, is contrary to the behavior expected of a DEA SA, and constitutes conduct that will not be condoned by DEA. Professional as well as personal integrity and character are core expectations of public service and employment with a law enforcement agency.

Given your position as a criminal investigator, DEA must routinely share potential impeachment information about, *inter alia,* findings of misconduct that reflect upon the truthfulness of an employee, with prosecutors conducting *Giglio* analyses of potential witnesses. *See* DOJ Justice Manual 9-5.001, et seq. Providing misleading and less than forthcoming information to OPR Inspectors is an act of misconduct incompatible with your current job duties and responsibilities as a DEA SA.

As a law enforcement agency, DEA must be able to rely on its employees to be truthful at all times. However, your actions have led to significant concerns about your employment with DEA, in that your conduct, as described herein, is incompatible with the duties and responsibilities of a DEA SA. Dishonesty raises questions about an individual's reliability and trustworthiness. Your supervisors must have total confidence in your integrity, judgment, and decision making skills. However, given the serious nature of your misconduct, DEA has lost its trust and confidence in you.

Danielle L. Dreyer

Page 19

I considered alternative penalties but, given the seriousness of the misconduct, I do not believe a penalty other than a proposed removal is adequate or effective to deter this type of misconduct in the future.

For all of the reasons detailed above, I find your conduct is clearly prejudicial to DEA. The proposed action is fully warranted and necessary to promote the efficiency of the service.

**Right to Review Material and Answer**

You have the right to review the material upon which this proposal is based. You may contact SAC Frank A. Tarentino, III, New York Division, and he will make this material available to you. If you have any questions about this proposed action, you may communicate with the Employee Relations Unit in person, by telephone at (571) 776-3677, or by mail at DEA Headquarters, 8701 Morrissette Drive, Springfield, Virginia 22152.

You have the right to reply to this notice either orally or in writing, or both. Any reply you choose to make should be directed to the Deciding Official, Human Resources Division, DEA Headquarters, 8701 Morrissette Drive, Springfield, Virginia 22152. You may also contact the Office of the Deciding Official via e-mail at decidingofficials@dea.gov. You may also submit affidavits and other evidence in support of your reply, including medical documentation (as defined in 5 CFR Part 339) to support any medical condition alleged to have contributed to the misconduct upon which the proposed action is based.

You will be given ten (10) calendar days from the date you receive this notice to present your reply to this proposal. The Deciding Official, upon review of the evidence of record (to include any response you choose to provide), may affirm the proposal, reduce the proposed penalty, issue a non-disciplinary letter of caution, or completely clear you of any wrongdoing.

**Right to a Representative**

You may have a representative or attorney assist you, if you desire. If you choose to have a representative, you must provide a written designation of your representative to the Deciding Official. Upon request, you and your representative (if a DOJ employee) will each be allowed up to eight (8) hours of official time to prepare your reply. Consideration will be given to extending the ten (10) day and/or eight (8) hour period if you submit a request in writing to the Deciding Official stating your reasons for desiring more time. Full consideration will be given to any reply you submit.

**Adverse Action Statutory Appeal Rights**

After a decision is made regarding this proposal, you may have the right to appeal this matter to an outside agency, or internally through the grievance procedures. You also may have the right to seek redress if you believe that the Agency proposed this action in reprisal for a protected activity. Information regarding the forums available to you is detailed below. Please be advised that the appeal rights listed below are not applicable in every case, and it is your responsibility to determine in what forum, if any, to file an appeal.

Danielle L. Dreyer                                                                Page 20

**Forums in Which You May Seek Redress**

**Merit Systems Protection Board**

  If the decision in this matter is a Removal, a Demotion (resulting in a reduction in grade or pay), or a Suspension of more than fourteen (14) days, you will then have the right to appeal that decision to the Merit Systems Protection Board (MSPB). Specific details for filing an MSPB appeal, including mailing addresses, time limitations, and representation rights, will be included in the correspondence you receive rendering the final decision in this matter. For more information, you may visit www.mspb.gov. Please note that probationers have limited rights of appeal to the MSPB.

**Office of Special Counsel**

  If you believe that this proposal, or any subsequent action, is in reprisal for your engaging in protected activity, such as whistleblowing, you may seek corrective action with the United States Office of Special Counsel (OSC), by filing a complaint at www.osc.gov. Please be advised that you will be limited to those matters within the OSC's jurisdiction and foreclosing your appeal of other issues. For more information, you may visit www.osc.gov.

**US Equal Employment Opportunity Commission**

  If you believe that this proposal, or any subsequent action, is in reprisal for your engaging in Equal Employment Opportunity (EEO) activity, or because you are a member of a protected group, you may initiate a complaint with a local EEO counselor. For a current list of EEO counselors, you may visit DEA Intranet/Webster/Employees/EEO/Discrimination Complaint Procedures/EEO Counselor Roster. Please be advised you will be limited to those matters within the Equal Employment Opportunity Commission's (EEOC) jurisdiction and foreclosing your appeal of other issues. For more information, you may visit www.EEOC.gov.

**US Department of Labor**

  If you believe your past, present, or future connection with uniformed service is a motivating factor of this proposal, you may seek assistance from the U.S. Department of Labor, Veterans Employment and Training Service (VETS). VETS is the government agency authorized to investigate and resolve complaints of violations of the Uniformed Services Employment and Reemployment Rights Act (USERRA). For assistance in filing a complaint, or for any other information on USERRA, contact VETS at 1-866-4-USA-DOL or visit its website at www.dol.gov/agencies/vets.

**Administrative Grievance Procedure**

  If you are unable to seek redress in one of the forums listed above, you may grieve the decision to higher-level management within DEA. Specific details for filing a grievance, including mailing addresses, time limitations, and representation rights, will be included in the correspondence you receive rendering the final decision in this matter. For more information, you may contact the

*Danielle L. Dreyer*

Page 21

Employee Relations Unit in person, by telephone at (571) 776-3677, or by mail at DEA Headquarters, 8701 Morrissette Drive, Springfield, Virginia 22152.

**Conclusion**

As soon as possible after your reply is received, or upon expiration of the ten (10) calendar-day limit should you choose not to reply, a written decision will be issued to you. If you do not submit a reply, a decision will be made based on all the information available at the end of the answer period. If you do submit a reply, it will be given full and careful consideration. However, no decision will be effected until the end of the thirty (30) day notice period. Until such time, you will be placed on limited duty.

Sincerely,

MATTHEW LANKENAU
Digitally signed by
MATTHEW LANKENAU
Date: 2023.01.26
14:43:03 -05'00'

Matthew W. Lankenau
Chairman
Board of Professional Conduct

**U. S. Department of Justice**

Drug Enforcement Administration

Office of the Deciding Official

_____

*www.dea.gov*                                              April 26, 2023

Danielle Dreyer
Criminal Investigator
Drug Enforcement Administration
New York Division

Dear Ms. Dreyer:

By letter dated January 25, 2023, Board of Professional Conduct Chairman, Mathew W. Lankenau, proposed you be removed from your position of Criminal Investigator with the Drug Enforcement Administration (DEA) and the Federal service based upon the charges of: ***Conduct Unbecoming a DEA Special Agent; Use/Possession of Drugs** (Three Specifications)**; Failure to Follow Written or Oral Instructions** (Two Specifications); and **Lack of Candor** (Two Specifications)**.* Chairman Lankenau's letter also contained the specific reasons for the proposed removal and informed you of your right to reply orally or in writing or both within ten calendar days of your receipt of the letter. On February 10, 2023 you confirmed receipt of the proposal. Your attorney requested an extension to respond which was granted.

I have carefully examined the evidence of record contained in the Office of Professional Responsibility investigative file. Based on a preponderance of evidence, I find the charges cited above and all specifications to be supported; therefore, the proposal in its entirety is sustained. I have taken into consideration all pertinent Douglas Factors, your years of government service, your prior work performance, and the lack of a prior disciplinary record. As a DEA Special Agent, you are held to a higher standard of personal conduct, both on duty and off duty, in order to promote public confidence in the integrity and dependability of DEA.

***Therefore, it is my decision to remove you from your position with DEA and from Federal service effective upon your receipt of this letter. Your removal from DEA is necessary and will promote the efficiency of the service.***

You may appeal this action to the Merit System Protection Board (MSPB), New York Field Office, 26 Federal Plaza, Room 3137-A, New York, NY, 10278-0022; telephone number (212) 264-9372. The MSPB website, www.mspb.gov has information on filing your MSPB appeal electronically. For your appeal to be considered by the Board, it must be in writing, must be submitted no later than 30 calendar days after the effective date of your removal, and must include your reasons for contesting the action, along with such proof and pertinent documentation as you are able to submit. If your appeal is not submitted within the time set by statue, regulation, or order of the judge, it will be dismissed as untimely filed unless a good reason for the delay is shown. The judge will provide you an opportunity to show why the appeal should not be dismissed as untimely.

You may have a representative or attorney assist you in your appeal.  The Employee Relations Unit, DEA Headquarters, 8701 Morrissette Drive, Springfield, Virginia 22152, telephone (571) 776-3172, can provide you with information concerning appeal procedures if you so desire.

Sincerely,

Christopher T. Fletcher
Deciding Official
Office of the Deciding Official